UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PHILLIP FLORES, ET AL.,

Plaintiffs,

v.

VELOCITY EXPRESS, LLC, et al.,

Defendants.

Case No.12-cv-05790-JST

**ORDER GRANTING PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY
JUDGMENT**

Re: ECF No. 241

Before the Court is Plaintiffs' motion for partial summary judgment as to misclassification and willfulness. ECF No. 241. The Court will grant the motion in its entirety.

## I.    BACKGROUND

In this collective action, Plaintiffs allege that Defendants violated the Fair Labor Standards Act ("FLSA") and California law by misclassifying their drivers as independent contractors. The following facts are undisputed except where noted.

### A.  Defendants

Beginning in December 2009, Defendant Velocity Express, LLC ("Velocity") began operating its delivery logistics, freight forwarding, and brokering business. Wheeler Decl., ECF No. 44-1 at 3, ¶ 3. In its standard services proposal to its customers, Velocity described itself as "America's largest national ground shipping provider dedicated exclusively to regional delivery." ECF No. 242-6 at 2. Velocity's managerial employees testified that Velocity was primarily a delivery business. See Curcuru Depo., ECF No. 242-12 at 70-71 (characterizing Velocity's business as "[d]elivering product to the end user"); Healey Depo., ECF No. 242-16 at 4-5 (affirming that "the general operation of [Velocity] is just to move products from one destination to the next destination"). Velocity went defunct in December 2013. ECF No. 150 at 5.

Defendant TransForce, Inc. ("TransForce") is a transportation logistics company. ECF No.

150 at 6-7.  Defendant Dynamex, Inc. ("Dynamex") is a transportation service provider and a subsidiary of TransForce.  Id.  TransForce and Dynamex purchased Velocity in 2012, before Velocity went defunct.  ECF No. 147 at 6.

## B. Velocity's Driver Requirements

Velocity did not own its own vehicles, but rather hired drivers as independent contractors to perform delivery services.  Wheeler Decl., ECF No. 44-1 ¶ 6.

To qualify as a driver, an individual had to meet the minimum age requirements, have a car and a valid driver's license, speak English, and pass the required background and drug screens. ECF No. 242-59; Odud Depo., ECF No. 242-7 at 126-128; see also, ECF No. 242-34 at 3.  Drivers were also required to successfully complete a Department of Transportation-required road rest and obtain insurance that complied with Velocity's insurance requirements (at least an A- rating) or, alternatively, enroll in Velocity's insurance program.  ECF No. 242-59; Healey Depo., ECF No. 242-16 at 18-20.  Velocity penalized drivers who did not meet its insurance requirements by deducting $50 per week from their pay.  ECF No. 242-23.  An individual did not need to have any particular level of education, specialized training, or special license to be a driver for Velocity. Healey Depo., ECF No. 242-16 at 36-37.

## C. Independent Contractor Agreement

Before a driver began working for Velocity, he or she was required to sign the "Independent Contractor Agreement for Transportation Services."  ECF No. 242-9; Odud Depo., ECF No. 242-7 at 108-09; Wheeler Depo., ECF No. 242-8 at 7.  All three bellwether Plaintiffs[1] signed this agreement.  See ECF Nos. 242-78, 242-27, 242-30 at 3.

Pursuant to that agreement, the driver "shall provide and use for the performance of his services hereunder a lawfully registered and safe vehicle capable of satisfying [Velocity's] and its customers' Control and Custody standards."  Id. ¶ 8(a).  Drivers are also "required to satisfy customer contractual requirements regarding drivers' qualifications, such as minimum age,

---

[1] Pursuant to the parties' stipulation, the Court entered an order providing for the conduct of three bellwether trials.  ECF No. 188 at 2.

experience, good driving records, criminal history, drug screening, etc." Id. In addition, drivers "shall obtain appropriate signage for its motor vehicle" consistent with customer expectations. Id. ¶ 8(d). Drivers were also required to "wear the appropriate uniform at all times while performing services under this Agreement." Id. ¶ 12. Drivers and any substitute drivers that they employed were required to comply with Velocity's substance abuse policy, Velocity's drivers' qualification policy, and all similar customer qualification requirements. Id. ¶ 16.

The agreement was for a monthly term that automatically renewed unless terminated by either party. ECF No. 242-9 ¶ 2; Wheeler Depo., ECF No. 242-8 at 7-8. The agreement could be terminated at any time and for any reason by either party with fourteen days prior written notice to the other party. ECF No. 242-9 ¶ 18. Velocity also had the right to terminate the agreement at any time with five days notice if it determined in its sole discretion that the route was no longer profitable. Id. If either party committed a material breach of the agreement, the other party could immediately terminate the agreement. Id.

**D. Velocity's Right to Control Drivers' Work**

Velocity negotiated directly with potential customers, designed the delivery routes, and determined what the route would pay before they hired a driver to perform the route. Wheeler Depo., ECF No. 242-8 at 67-68, 5-6; Curcuru Depo., ECF No. 242-12 at 11-12; Healey Depo., ECF No. 242-16 at 2 (testifying that the operations manager "design[s] the routes"). Once the route was established, Velocity advertised to find a driver to work the route. Wheeler Depo., ECF No. 242-8 at 66-68.

Velocity required its drivers to wear a Velocity uniform and an identification badge. See ECF No. 242-9 at 5; ECF No. 242-31.[2] Several of Velocity's managerial employees admit that Velocity required drivers to wear uniforms pursuant to customer requirements. Healey Depo., ECF No. 242-16 at 21; Odud Depo., ECF No. 242-7 at 25; Curcuru Depo., ECF No. 242-12 at 41-42. Certain customers also required the drivers to place signage on their vehicles. ECF No.

---

[2] Despite testimony from multiple Velocity witnesses confirming the existence of a mandatory uniform policy, Defendant argues that this is disputed. ECF No. 245 at 22, n. 10. The Court rejects this argument at length below.

245 1 at 266; Odud Depo., ECF No. 242-7 at 95- 104 (discussing signage requirements). For example, one of Velocity's customers expected drivers to comply with best practices regarding "[s]ignage" and "[p]rofessional appearance Both Driver & Vehicle." ECF No. 242-40 at 13.

Velocity gave its drivers a manifest each day that told them what packages to deliver by what time. Healey Depo., ECF No. 242-16 at 38.[3] And Velocity's drivers were required to deliver their packages by a certain time pursuant to customer requirements. Odud Depo., ECF No. 242-7 at 55-56, 73; Healey Decl., ECF No. 245-1 at 262, ¶ 4; Curcuru Depo., ECF No. 242-12 at 26-27. Before making their deliveries, drivers had to arrive at Velocity's warehouse to scan and load parcels, which could take up to two or more hours. Odud Depo., ECF No. 242-7 at 48, 50, 55-61, 48. Some drivers were also required to return to the warehouse at the end of the day. Id. at 29, 79.

Velocity required drivers to follow a series of rules when delivering products to its customers. Odud Depo., ECF No. 242-7 at 23. Some of these "standard operating procedures" were developed by Velocity's customers, and Velocity enforced its own standard operating procedures as well. See Curcuru Depo., ECF No. 242-12 at 59-63 (discussing standard operating procedures regarding building security). Drivers were expected to comply with standard operating procedures regarding building security and, in some cases, best practices regarding customer service. ECF No. 242-37; ECF No. 242-40. Velocity also briefed its drivers on "the Velocity Promise" regarding customer service expectations. Odud Depo., ECF No. 242-7 at 22-23. Regardless of whether drivers elected to purchase separate insurance or enroll in Velocity's insurance program, they were required to report even minor accidents to Velocity. Wheeler Depo., ECF No. 242-8 at 71-72.

**E. Plaintiff James Mack**

Plaintiff James Mack worked for Velocity in San Diego for approximately four or five years. Mack Depo., ECF No. 242-28 at 1-3, 7-8, 41, 61. While he was working for Velocity, Mr.

---

[3] The parties dispute whether drivers were allowed to deviate from the order of stops listed in the manifest, but Velocity does not dispute that it designed the route and gave its drivers a manifest listing the route order.

Mack worked five or six days a week, depending on the time of year, from around 4:00 a.m. until 7:00 p.m.  Id. at 61-63, 21-24.

To perform services for Velocity, Mr. Mack invested in two vans and, a rental truck, and a Velocity shirt.  Id. at 36-37, 55-56.  Mr. Mack also purchased insurance through Velocity's insurance program, the payments for which were deducted from his weekly settlement check.  Id. at 46-47.  Mr. Mack hired his wife and son as helpers while working at Velocity, both of whom had to go through Velocity's hiring process.  Id. at 25-30, 34.

Mr. Mack would start his work day at Velocity's San Diego warehouse, where he was required to sort and scan his packages for the day and load them onto his vehicle.  Id. at 9-12.  Before Velocity used scanners, it provided Mr. Mack with a paper log that he was required to fill out and turn into Velocity on a weekly basis.  Id. at 13-15.  Mr. Mack also ended his day at the warehouse, where he unloaded any returns and scanned packages back in.  Id. at 9-12, 17.  While performing work for Velocity, Mr. Mack was required to wear a Velocity uniform and identification badge and place a magnetic sign on his vehicle.  Id. at 10-13, 55-56.[4]

During the first "couple of months" that Mr. Mack provided services to Velocity, he also provided services to another company, Central Freight.  Id. at 1-2.  In addition, Mr. Mack did a few short-term assignments for other companies during his last three months of employment with Velocity.  Id. at 32.  Other than that, Mr. Mack testified that he did not perform work for any other company and that 100 percent of his income came from Velocity.  Id. at 37-38.  He further testified that, although he could have worked for another company while he was working for Velocity, he "didn't have enough time."  Id.  Mr. Mack eventually started looking for another job because Velocity was going out of business.  Id. at 31.

**F.  Plaintiff Claude Boconvi[5]**

Plaintiff Claude Boconvi began providing services for Velocity in January 2011.  Boconvi

---

[4] Defendants claim that there is a genuine dispute of material fact as to whether Mr. Mack was required to place a magnetic sign on his vehicle.  The Court addresses that argument below.
[5] Defendants argue that Mr. Boconvi is not credible due to discrepancies between his deposition testimony and his questionnaire responses.  ECF No. 245 at 26, 44, n. 24.  The Court addresses that argument below.

Depo., ECF No. 242-14 at 60.  Mr. Boconvi worked exclusively for Velocity for approximately six weeks, during which time he worked Monday through Friday between 6:00 a.m. and 8:00 p.m. or 9:00 p.m., and sometimes as late as 10:15 p.m.  Boconvi Depo., ECF No. 242-14 at 1-2, 4-6, 9, 49-50.

To perform services for Velocity, Mr. Boconvi purchased a used van for less than $10,000, two dollies for less than $300 total, a uniform for under $50, and an employer identification number for approximately $9.  Id. at 14-17, 29; ECF No. 245-1 at 103.  Mr. Boconvi also purchased insurance through Velocity's insurance program, the payments for which were deducted from his weekly settlement check.  Boconvi Depo., ECF No. 242-14 at 17-18.  Mr. Boconvi testified that he never hired a helper because he could not afford it.  Id. at 56.

Velocity assigned Mr. Boconvi a route making deliveries between Houston and Huntsville, Texas.  Id. at 1-2, 39.  Mr. Boconvi asked for another route during his first couple of days because his assigned route had too many stops, but he was told that there were no other routes available. Id. at 39-41.  Defendants also gave Mr. Boconvi a manifest each day listing all of the stops on his route.  Id. at 43.  Mr. Boconvi followed the sequence listed on the manifest for the first two weeks, but then he began delivering out of sequence to be more efficient.  Id. at 44-45.  At each stop, Mr. Boconvi was required to gather a signature on his manifest list.  Id. at 52-53.  At the end of the day, Mr. Boconvi had to return to the warehouse to turn in the signed manifest and drop off any returned mail.  Id. at 35, 38.  Mr. Boconvi was required to wear a uniform while providing services to Velocity, but he did not have any Velocity signage on his vehicle.  Id. at 55-56. Because Velocity had not started using scanners yet, Plaintiff Boconvi was not required to use a scanner.  Id. at 102.

Mr. Boconvi testified that he could not provide services for any other companies while he was working at Velocity because he was "working all day from 6:00am to 10:00."  Id. at 57.  Mr. Boconvi testified that he stopped working at Velocity because he had a transmission problem with his van and did not have enough money to repair it.  Id. at 63.

**G.  Plaintiff Charles Chambers**

Plaintiff Charles Chambers began providing services to Velocity through his company,

Titan Trucking Services, in approximately April 2010. Chambers Depo., ECF No. 242-25 at 14-15. He worked for Velocity for about a year or a year and a half, during which time his routes typically ran Monday through Friday for between twelve and a half to fourteen hours each day. Id. at 82, 29, 41.

To perform his work for Velocity, Mr. Chambers purchased two box trucks (one $3,000 and one unknown price), uniforms, carrying straps ($40), blankets, tie down straps ($30), and safety equipment like fire extinguishers, extra fuses, flares, and a log book. Id. at 12-14, 43-44, 85-87. Velocity helped Mr. Chambers to obtain the necessary insurance. Id. at 72-73. Mr. Chambers hired his cousin and his friend to help him, and he testified that Velocity could have rejected his helpers if they didn't meet Velocity's requirements. Id. at 32, 95.

Velocity told Mr. Chambers which routes were available for a given day and how much each route would pay. Id. at 24-25, 38. Mr. Chambers testified that he could turn down routes, but that he "didn't turn down too many" for revenue purposes. Id. Mr. Chambers began his day at the warehouse, where he loaded his truck for about half an hour. Id. at 42. Velocity also gave him paperwork listing all of the stops on the route and the time at which each package had to be delivered. Id. at 93-94. While providing services to Velocity, Mr. Chambers was required to wear a uniform and to place Velocity signage on his vehicle. Id. at 73, 8, 44-45.

Chambers testified that he sometimes performed "freelance" work on the side for individuals while he was working for Velocity, such as moving a couch, but that he did not provide services for any other companies during his time at Velocity. ECF No. 242-25 at 45-46, 57. He further testified that the majority of his income came through Velocity and that it was "hard" to work for another company because "you're driving so many hours a day and you get back, get a little bit of rest and you're gone again." Id. at 46-47.

### H. Defendants' Knowledge of Litigation Risk Associated with Independent Contractor Classification

As early as 2008, the Judicial Panel on Multidistrict Litigation consolidated eight different actions against Velocity that "share[d] factual questions arising from the classification of certain package delivery drivers as independent contractors rather than employees." ECF No. 244-78.

In 2012, when TransForce and Dynamex were in the process of acquiring Velocity, due diligence revealed that there was a significant litigation risk related to Velocity's classification of its delivery drivers as independent contractors. Leveridge Depo., ECF No. 242-11 at 5-7; Langlois Depo., ECF No. 242-71 at 1-5; Smith Depo., ECF No. 244-68 at 8; ECF No. 244-77 at 3, 54 (noting that "the issue of I/C vs Employee Status is one risk that they have to deal with on a regular basis" and that "the IC vs Employee issue is a major risk for the company"). Specifically, Velocity's disclosures revealed that Velocity was appealing two decisions in which state regulatory boards in New York and Washington concluded that Velocity's drivers were employees, not independent contractors, for the purpose of state unemployment and workers' compensation, respectively. Langlois Depo., ECF No. 242-71 at 6-17; see also, ECF No. 242-73 (disclosing pending litigation). Those disclosures further revealed that the Washington state decision prompted an audit by the Washington State Department of Labor and Industries. ECF No. 242-73 at 2-3. Defendants also knew that there was a pending collective action against Velocity in the Northern District of California. See Smith Depo., ECF No. 244-68 at 1-4, 15; Langlois Depo., ECF No. 242-71 at 16-17; ECF No. 242-73 at 2 (disclosing "[c]ollective/class action instituted by two IC drivers . . . alleging Fair Labor Standards violations in conjunction with misclassification as independent contractors").

## I. Procedural Posture

On November 9, 2012, Plaintiffs brought this case as a collective action under the Fair Labor Standards Act ("FLSA") and as a class action pursuant to California's Labor Code and Unfair Competition Law. ECF No. 1, ¶ 1.

In the operative Fourth Amended Complaint, ECF No. 140 ("FAC"), Plaintiffs allege that Defendants misclassified their delivery drivers as independent contractors when they were, in fact, employees. Id., ¶ 3. Because of this misclassification, Plaintiffs allege that Velocity Express failed to pay Plaintiffs minimum wages and overtime. Id. ¶¶ 2, 3. Plaintiffs assert the following causes of action: (1) failure to pay minimum wage under the FLSA (29 U.S.C. § 201, *et seq.*); (2) failure to pay overtime wages under the FLSA (29 U.S.C. § 201, *et seq.*); (3) failure to pay minimum wage and overtime under California law (California Labor Code §§ 510, 1194 and IWC

8

Wage Order No. 9); (4) willful misclassification of individuals as independent contractors under California law (California Labor Code § 226.8); (5) failure to provide meal periods (California Labor Code §§ 226.7, 512 and IWC Wage Order No. 9); (6) failure to provide mileage reimbursement (California Labor Code § 2802); (7) failure to furnish accurate wage statements (California Labor Code §§ 226, 226.3 and IWC Wage Order No. 9); (8) failure to keep accurate payroll records (California Labor Code §§ 1174, 1174.5 and IWC Wage Order No. 9); (9) waiting time penalties (California Labor Code §§ 201-203); (10) violation of California Business and Professions Code, § 17200, and the Unfair Competition Act; and (11) federal common law successor liability as to Defendants Dynamex and Transforce. Id.

On June 3, 2013, the Court conditionally certified a collective action under the FLSA. ECF No. 57. On April 16, 2015, the Court granted partial summary judgment for Plaintiffs on the issue of successor liability as to Defendants TransForce and Dynamex, but denied Plaintiffs' motion for partial summary judgment as to Defendants' joint-employer status. ECF No. 156. The parties agreed to conduct three bellwether trials. ECF No. 188.

Plaintiffs now move for partial summary judgment as to misclassification and willfulness with respect to bellwether Plaintiffs Claude Boconvi, Charles Chambers, and James Mack. ECF No. 241.

## II.    MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff moves for partial summary judgment on the following three issues: (1) whether all three bellwether Plaintiffs were misclassified as independent contractors under FLSA; (2) whether bellwether Plaintiff Mack was misclassified as an independent contractor under the California Labor Code; and (3) whether Defendants willfully misclassified the bellwether Plaintiffs. ECF No. 241.

### A. Legal Standard

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by" citing to depositions, documents, affidavits, or other materials. Fed. R. Civ. P. 56(c)(1)(A). A

party also may show that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986). A fact is "material" if the fact may affect the outcome of the case. Id. at 248. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).

Where the party moving for summary judgment would bear the burden of proof at trial, that party bears the initial burden of producing evidence that would entitle it to a directed verdict if uncontroverted at trial. See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc., 213 F.3d 474, 480 (9th Cir. 2000). Where the party moving for summary judgment would not bear the burden of proof at trial, that party bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claim, or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. If the moving party satisfies its initial burden of production, then the non-moving party must produce admissible evidence to show that a genuine issue of material fact exists. See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102–03 (9th Cir. 2000). The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996). Indeed, it is not the duty of the district court to "to scour the record in search of a genuine issue of triable fact." Id. "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some significant probative evidence tending to support the complaint." Summers v. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and internal quotation marks omitted). If the non-moving party fails to make this showing, the moving party is entitled to summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

### B. Evidentiary Objections

As a preliminary matter, the Court addresses Defendants' evidentiary objections. In their opposition brief, Defendants objected to most of the Plaintiffs' evidence, including archived images of Velocity's website, deposition transcripts, and deposition exhibits. ECF No. 245 at 12-15. Defendants argued that the Court may not consider this evidence because it has not been properly authenticated. Id.

However, those objections have since largely been resolved. Shortly after the Defendants filed their opposition brief, the parties stipulated that the archived websites are not properly authenticated. ECF No. 252 ¶ 1. The parties further stipulated that the deposition excerpts "are authentic copies of the transcripts created and produced in this case." Id. ¶ 2. Finally, the parties stipulated that the deposition exhibits "are true and correct copies of the documents submitted during the depositions . . . " Id. ¶ 3. The stipulation also states that "Defendants retain all other evidentiary objections raised in its opposition to the deposition transcripts and deposition exhibits including remaining disputes regarding foundation." Id. ¶ 4.

Because the parties have stipulated that the archived website images are not properly authenticated, the Court does not consider those exhibits when ruling on this motion. The Court does, however, consider the deposition excerpts. Defendants only objected to the deposition excerpts on the ground that they were not properly authenticated, and Defendants have since waived that objection via the parties' stipulation. The Court accordingly considers those deposition excerpts.

Although the parties have since stipulated that the deposition exhibits are true and correct copies of the exhibits submitted during the depositions, Defendants appear to raise another objection to these exhibits in their opposition brief. Specifically, Defendants argue that "labeling a document as an exhibit to a deposition does not, itself, suffice to qualify it as admissible evidence for purposes of a motion for summary adjudication." ECF No. 245 at 15. Defendants are correct. See Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1182 (9th Cir. 1988). Two of the Plaintiffs' exhibits—Exhibit 5 and Exhibit 78—are not supported by any foundational testimony to establish that the documents are in fact what the Plaintiffs claim they are. Id. However, the

remainder of Plaintiffs' exhibits are authenticated by foundational testimony in the deposition excerpts. Therefore, the Court considers those exhibits when ruling on this motion.

### C. Misclassification

All three Plaintiffs move for partial summary judgment on the issue of misclassification under the FLSA, and Plaintiff Mack moves for summary judgment that he was misclassified as an employee under California law. ECF No. 241.

#### 1. FLSA's "Economic Reality" Test

To determine whether an individual is an employee or an individual contractor under FLSA, courts apply the economic reality test: "[E]mployees are those who *as a matter of economic reality* are dependent upon the business to which they render service." Real v. Driscoll Strawberry Assocs., Inc., 603 F.2d 748, 754 (9th Cir. 1979) (quoting Bartels v. Birmingham, 332 U.S. 126, 130 (1947) (emphasis in original)).

Courts consider the following non-exhaustive factors to guide their application of the economic reality test: "1) the degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; and 6) whether the service rendered is an integral part of the alleged employer's business." Id. at 754. "The presence of any individual factor is not dispositive of whether an employee/employer relationship exists. Such a determination depends 'upon the circumstances of the whole activity.'" Id. at 745-55 (quoting Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947)).

Plaintiffs bear the burden of proving that they were employees covered under FLSA. Benshoff v. City of Virginia Beach, 180 F.3d 136, 140 (4th Cir. 1999) ("Those seeking compensation under the Act bear the initial burden of proving that an employer-employee relationship exists and that the activities in question constitute employment for purposes of the Act."). Plaintiffs argue that "the undisputed material facts establish that Plaintiffs are employees as a matter of law under the economic realities test." ECF No. 241 at 30. The Court therefore

analyzes the evidence as to each factor, construing all reasonable inferences in favor of Defendants, to determine whether Plaintiffs have met their burden and whether a jury could reasonably conclude that any of the three bellwether Plaintiffs were independent contractors.

### 2. California's "Right-to-Control" Test

Courts apply a similar test to determine whether an individual is an employee or an independent contractor under California law. See Guitierrez v. Carter Bros. Sec. Servs., LLC, No. 2:14-CV-00351-MCE, 2014 WL 5487793, at *5 (E.D. Cal. Oct. 29, 2014). In fact, "California's common law the test is so similar to federal law that at least one court in this District has declined to apply the California rules separately and instead applied the FLSA test even to state law labor claims." Johnson v. Serenity Transportation, Inc., No. 15-CV-02004-JSC, 2016 WL 270952, at *15, n. 9 (N.D. Cal. Jan. 22, 2016).

Under California's test, "the right to control work details is the *most important or most significant* consideration." Ruiz v. Affinity Logistics Corp., 754 F.3d 1093, 1100 (9th Cir. 2014) (quoting S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations, 769 P.2d 399, 407 (1989)). California courts also consider the following "secondary" factors: "(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." Id.[6] "Generally, ... [these] individual factors cannot be

_____

[6] Given the substantial overlap between the FLSA test and California's test, the Court rejects Defendants' contention that cases applying California's employment test "have little bearing" on Plaintiffs' employment status under the FLSA. ECF No. 245 at 32. Both tests consider the alleged employer's right to control, the skill required to perform the work, the investment in equipment and helpers, the degree of permanence, and whether the services provided are integral to the alleged employer's business. Therefore, the Court looks to cases in which courts have applied those overlapping factors in analogous contexts—i.e., to delivery drivers—regardless of whether those factors were applied under California law or the FLSA.

applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." Id. (quoting Germann v. Workers' Comp. Appeals Bd., 176 Cal.Rptr. 868, 871 (1981) (internal quotation marks omitted)).

Although Plaintiffs bear the burden of proving that they are employees under the FLSA, Defendants bear the burden of proving that Mack was an independent contractor under California law. "[U]nder California law, once a plaintiff comes forward with evidence that he provided services for an employer, the employee has established a prima facie case that the relationship was one of employer/employee." Narayan v. EGL, Inc., 616 F.3d 895, 900 (9th Cir. 2010). "Once the employee establishes a prima facie case, the burden shifts to the employer, which may prove, if it can, that the presumed employee was an independent contractor." Id. Because it is undisputed that Mack provided services for Velocity, the burden shifts to Defendants to prove that Mack was an independent contractor, not an employee. Therefore, Defendants must point to sufficient evidence from which a jury could reasonably conclude that Mack was an independent contractor under California law.

### 3. The Independent Contractor Agreement and Subjective Intent

Before turning to the relevant factors under both tests, the Court first addresses Defendants' reliance on Plaintiffs' classification as independent contractors in the Independent Contractor Agreement and Plaintiffs' testimony that they considered themselves to be independent contractors. ECF No. 245 at 16-18, 20, 24, 28.

This evidence is not determinative of Plaintiffs' employment status under either the FLSA or California law. As the Ninth Circuit explained in Real, "[e]conomic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA." Real, 603 F.2d at 755. Like the agreement in Real, Velocity's independent contractor agreement "labels the [plaintiffs] as 'independent contractors' and employs language . . . that parrots language in cases distinguishing independent contractors from employees." Id.; ECF No. 245-1 at 127-130. But "[t]hat contractual language . . . is not conclusive." Real, 603 F.2d at 755. "Similarly, the subjective intent of the parties to a labor contract cannot override the economic realities reflected in the factors described above." Id.

The California Supreme Court has similarly held that "[t]he label placed by the parties on their relationship is not dispositive . . ." Borello, 48 Cal. 3d at 349.  Although the parties' subjective beliefs about the relationship are a secondary factor under California's right-to-control test, "the California Court of Appeal has noted that the label that parties place on their employment relationship 'is not dispositive and will be ignored if their actual conduct establishes a different relationship.'" Ruiz, 754 F.3d at 1101 (quoting Estrada v. FedEx Ground Package Sys., Inc., 64 Cal. Rptr. 3d 327, 335 (2007)).  For example, in Estrada, a California court of appeal held that plaintiff delivery drivers were employees under California law even though their contract with the defendant described them as independent contractors, finding that "the evidence shows unequivocally that FedEx's conduct spoke louder than its words." Estrada, 64 Cal. Rptr. 3d at 336.

Therefore, the Court must delve deeper into the parties' actual conduct and the economic reality of their relationship to determine whether the Plaintiffs were employees or independent contractors.  The Court now turns to each of the relevant factors listed above.

**4.  Velocity's Right to Control the Manner of Work**

Even assuming all factual inferences in favor of Defendants, this factor strongly favors employee status under both the FLSA and California law.

The Ninth Circuit has granted summary judgment to plaintiff delivery drivers regarding misclassification in two analogous cases that involved similar facts.  In Slayman v. FedEx Ground Package Sys., Inc., the Ninth Circuit analyzed the degree of the defendant's control over its delivery drivers to determine whether they were employees under Oregon's right-to-control test. 765 F.3d 1033 (9th Cir. 2014).[7]  On the same day that the Slayman decision was issued, the Ninth

---

[7] Defendants argue that Slayman is inapposite because the court applied Oregon law, not the FLSA test.  ECF No. 245 at 32.  However, "Oregon courts have noted these factors are 'similar to' the four factors examined under the FLSA's economic-realities test."  Gonzales v. Sterling Builders, Inc., No. 08-CV-943-BR, 2010 WL 1875620, at *8 (D. Or. May 6, 2010) (agreeing with the parties that "the analysis of Defendants' status was not materially different under Oregon law"); see also, e.g., Mathis v. Hous. Auth. of Umatilla Cty., 242 F. Supp. 2d 777, 782–83 (D. Or. 2002) (applying "the same FLSA analysis" to plaintiff's Oregon state law claims to determine whether plaintiff was an employee or an independent contractor).  Like FLSA's economic reality test and California's right-to-control test, Oregon law considers the alleged employer's right to control the work, among other factors.  Slayman, 765 F.3d at 1042 ("Direct evidence of the right

15

Circuit issued a substantially similar decision in which it applied California's right-to-control test and held that FedEx drivers were also employees under California law.  See Alexander v. FedEx Ground Package Sys., Inc., 765 F.3d 981, 990 (9th Cir. 2014).

In both cases, the court considered three major indicators of control.  First, the court found that "FedEx can and does control the appearance of its drivers and their vehicles." Slayman, 765 F.3d at 1042-43; Alexander, 765 F.3d at 989.  Specifically, FedEx required drivers to wear a uniform and to attach FedEx decals to their vehicles, among other requirements.  Slayman, 765 F.3d at 1039-40.  Second, the court considered that "FedEx can and does control the times its drivers can work."  Id. at 1043; Alexander, 765 F.3d at 989.  Although the contractor agreement "[did] not allow FedEx to set its drivers' specific working hours down to the last minute," FedEx "structure[d] drivers' workloads so that they have to work 9.5 to 11 hours every working day" and required drivers to arrive at terminals in the morning and to return to terminals by a specific time. Id. at 989-90.  The court noted that "[t]he combined effect of these requirements is substantially to define and constrain the hours that FedEx's drivers can work."  Id.  Third, the court considered that "FedEx can and does control aspects of how and when drivers deliver their packages."  Id. Specifically, FedEx "assigns each driver a specific service area," "tells drivers what packages they must deliver and when," and "negotiates the delivery window for packages directly with its customers."  Id.  In addition, "[a]fter each delivery, drivers must use an electronic scanner to send data about the delivery to FedEx."  Id. at 984.  FedEx also "trains its drivers on how best to perform their job and to interact with customers," conducts evaluations to ensure that drivers meet customer service standards, and requires drivers to follow its "Safe Driving Standards."  Id. at 985. Based on all of these considerations, the court concluded that "FedEx's policies and procedures unambiguously allow FedEx to exercise a great deal of control over the manner in which its drivers do their jobs," and therefore this factor "strongly favor[ed] employee status."  Id. at 989, 997.  The court held that the FedEx drivers were employees as a matter of law under both

to control is the most important factor under Oregon law.").  Given the legal and factual overlap, Slayman is instructive here.

California's and Oregon's right-to-control test[8] and remanded to the district court with instructions to enter summary judgment for plaintiffs on the question of employment status. Id. at 997; Slayman, 765 F.3d at 1047, 1041.

In Collinge v. IntelliQuick Delivery, Inc., a district court considered similar factors to determine whether delivery drivers were employees or independent contractors under the FLSA. No. 2:12-CV-00824 JWS, 2015 WL 1299369 (D. Ariz. Mar. 23, 2015). First, the court considered that "IntelliQuick can and does control its drivers' appearance": "All drivers are required to wear an IntelliQuick uniform, including a red IntelliQuick shirt and black pants or shorts, accompanied by an IntelliQuick identification ("ID") badge." Id. at *2. "Second, IntelliQuick trains its drivers on its policies and procedures," such as how to fill out paperwork and "the proper way to greet customers," among other requirements. Id. "Third, IntelliQuick subjects its drivers to a series of 'uniform standard operating procedures' ('SOPs'), which regulate what the drivers are required to do, within which 'time frame' they must do it, what they are required to wear, and which equipment they must use." Id. at *3. IntelliQuick also "monitor[ed] its drivers work using [a system] which allow[ed] IntelliQuick to know where its drivers are at all times and to communicate with them." Id. "Fourth, IntelliQuick dispatchers have discretion to unilaterally assign pick-ups to Route and Freight Drivers." Id. "Fifth, IntelliQuick controls the time that Freight and Route Drivers must start their work": "IntelliQuick gives them a manifest that informs them of their deliveries, which vary from day-to-day, and the time by which the time-sensitive deliveries must be completed." Id. at *4. Based on all of these considerations, the court concluded that defendant's "policies and procedures allow [defendant] to exercise a great deal of control over the manner in which its drivers perform their jobs" and therefore that "this factor strongly favors plaintiffs." Id. at *2. After considering the other factors under the economic-realities test, the court concluded that "[e]ven when viewing the evidence in the light most favorable to defendants, it is clear that IntelliQuick exercises a great deal of control over the manner in which its drivers perform their work." Id. at *6. The court held that the drivers had

---

[8] The court also held that the drivers were employees under Oregon's broader economic-realities test. Id. at 1047.

been misclassified as independent contractors under the FLSA and accordingly granted partial summary judgment to the drivers.  Id. at *6, *7.

The bellwether Plaintiffs in this case have similarly pointed to significant undisputed evidence that suggests that Defendants had the right to control how they performed their work as delivery drivers.

First, Velocity could and did control the appearance of its drivers and their vehicles. Velocity required that the three bellwether Plaintiffs wear a Velocity uniform and an identification badge.  See ECF No. 242-9 at 5 ("Contractor shall wear the appropriate uniform at all times while performing services under this Agreement."); ECF No. 242-31.  Audit documents and internal emails suggest that Velocity expected managers to enforce these requirements and performed regular audits to ensure compliance.  ECF No. 242-17 ("I am not going to tell you again that your IC must be in uniform and it is up to you and your team to enforce this!"); ECF No. 242-50 at 3-9; ECF No. 242-35 at 13.  Velocity's managerial employees admit that Velocity required drivers to wear uniforms pursuant to customer requirements.  Healey Depo., ECF No. 242-16 at 21; Odud Depo., ECF No. 242-7 at 25; Curcuru Depo., ECF No. 242-12 at 41-42.[9]  And all of the Plaintiffs testified that they were required to wear a Velocity uniform.  Boconvi Depo., ECF No. 242-14 at 56; Chambers Depo., ECF No. 242-25 at 73; Mack Depo., ECF No. 242-28 at 55-56.  Velocity's contract with its drivers also states that "the Contractor shall obtain appropriate signage for its motor vehicle," and one of Velocity's network vice presidents testified that certain customers require the drivers to place signage on their vehicles.  ECF No. 245 1 at 266; Odud Depo., ECF

---

[9] Despite testimony from multiple Velocity witnesses confirming the existence of a mandatory uniform policy, Defendant argues that this is disputed because (1) "the Agreement . . . specifically laid out that [drivers] may need to wear a uniform 'to fulfill customer requirements' and 'for security purposes,'" and (2) "[t]he 'uniform' that Plaintiffs refer to was in fact only a shirt with a Velocity logo."  ECF No. 245 at 22, n. 10.  However, the reasons behind the uniform requirement do not create a dispute regarding its existence.  As the Eleventh Circuit has explained, "[t]he economic reality inquiry requires us to examine the nature and degree of the alleged employer's control, *not why the alleged employer exercised such control*."  Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1316 (11th Cir. 2013) (emphasis added).  Nor do the details of the uniform itself— i.e., that it consisted of just a shirt—create a material factual dispute.  Finally, although a Velocity area manager testified that some Velocity drivers wore their own company uniforms, Defendants do not dispute that all three bellwether Plaintiffs were required to wear a Velocity uniform. Curcuru Depo., ECF No. 245-1 at 274-75.

No. 242-7 at 95- 104 (discussing signage requirements).  Moreover, internal emails between Velocity managerial employees detail certain customer's best practices regarding "[s]ignage" and "[p]rofessional appearance Both Driver & Vehicle."  ECF No. 242-40 at 13.  Other internal emails include instructions on how to order magnetic Velocity signage for drivers' vehicles.  ECF No. 242-63.  Plaintiffs Mack and Chambers both testified that they were required to place magnetic signage on their vehicles while working for Velocity.  Mack Depo., ECF No. 242-28 at 56; Chambers Depo., ECF No. 242-25 at 8, 44-45.[10]  Chambers further testified that he had to take off his personal business logo on the side of his vehicle and replace it with the Velocity signage while he was working for Velocity.  Chambers Depo., ECF No. 242-25 at 7-8, 44-45.

Second, there is ample undisputed evidence in the record that Velocity could and did control when drivers can work.  Several Velocity managerial employees testified that drivers were required to deliver their packages by a certain time pursuant to customer requirements.  Odud Depo., ECF No. 242-7 at 55-56, 73; Healey Decl., ECF No. 245-1 at 262, ¶ 4; Curcuru Depo., ECF No. 242-12 at 26-27.  Velocity's audits and internal emails confirm that Velocity had the right to control when drivers performed their work.  ECF No. 242-35 at 14 ("Specific hours are not set but it is communicated that we expect all ICs off the dock and on route by 0900."); ECF No. 242-56 ("Is there something preventing the drivers from arriving earlier so they can depart earlier?").  Velocity admits that drivers had to arrive at Velocity's warehouse to scan and load parcels before making their deliveries, and this could take up to two or more hours. Odud Depo., ECF No. 242-7 at 48, 50, 55-61, 48.  Some drivers were also required to return to the warehouse at the end of the day.  Id. at 29, 79.  One Velocity witness admitted that drivers worked "[e]ight to ten" hours a day.  Id. at 79-80.  As the Ninth Circuit explained in in Slayman, "[t]he combined

---

[10] Defendant mischaracterizes Mack's deposition testimony to argue that Mack admitted that he was not required to keep the magnetic tag on his vehicle.  ECF No. 245 at 33.  Mack's statement that "You can take them off really," cannot reasonably be construed in that manner given the sentence that immediately precedes it: "Yeah, I had to get that too, put it on the vehicles."  ECF No. 242-28 at 56.  Given the statement's context, it is clear that Mack was simply indicating that the magnetic sign was temporary and could physically be removed.  Nor is Phil Healey's bare assertion in his declaration that "[he] never required Mr. Mack to have Velocity signage . . . on his vehicles" sufficient to create a genuine dispute given Velocity's contractual signage requirements, admissions by other Velocity managerial employees, and internal emails.  ECF No. 245-1 at 262.

effect of these requirements is substantially to define and constrain the hours that FedEx's drivers can work." Slayman, 765 F.3d at 1043.[11]

Third, Velocity could and did exercise significant control over how drivers performed their work. Velocity's managerial employees admit that Velocity had a series of rules that it required drivers to follow when delivering products to customers. Odud Depo., ECF No. 242-7 at 23. Some of these "standard operating procedures" were developed by Velocity's customers, but Velocity enforced its own standard operating procedures as well. See Curcuru Depo., ECF No. 242-12 at 59-63 (discussing standard operating procedures regarding building security). Internal emails between Velocity employees show that drivers were expected to comply with standard operating procedures regarding building security and, in some cases, best practices regarding customer service, among other issues. ECF No. 242-37; ECF No. 242-40. Velocity also briefed drivers on "the Velocity Promise" regarding customer service expectations. Odud Depo., ECF No. 242-7 at 22-23. One Velocity managerial employee testified that Velocity trained drivers on how to use the scanner and explained customer requirements to its drivers. Odud Depo., ECF No. 242-7 at 2-3, 93-94.[12] Like the defendant in Slayman and Alexander, Velocity negotiated directly with its customers to design the routes. Wheeler Depo., ECF No. 242-8 at 67-68; Curcuru Depo., ECF No. 242-12 at 11-12; Healey Depo., ECF No. 242-16 at 2 (testifying that the operations manager "design[s] the routes"). And, like the defendant in IntelliQuick, Velocity gave its drivers a manifest each day that told them what packages to deliver by what time. Healey Depo., ECF No. 242-16 at 38 (testifying that drivers "usually have a hard copy of that day's manifest with them"). There are several additional, undisputed indicia of control: Velocity required that its

---

[11] In an attempt to create a factual dispute on this point, Defendants point to Mr. Mack's manager's statement that "Velocity never required Mr. Mack to start his route at any specific time." ECF No. 245 at 33 (citing Phil Healey's declaration, ECF No. 245 1 at 262). This is immaterial. FedEx's contractor agreement "[did] not allow FedEx to set its drivers' specific working hours down to the last minute," but the Ninth Circuit nonetheless held that "FedEx structure[d] drivers' workloads" in a way that "substantially . . . define[d] and constrain[ed] the hours that FedEx's drivers can work." Alexander, 765 F.3d at 989-90. The same is true here.
[12] Because Velocity had not started using scanners yet, Plaintiff Boconvi was not required to use a scanner while making his deliveries. Boconvi Depo., ECF No. 242-25 at 13-14; Mack Depo., ECF No. 242-28 at 10-13. However, both Chambers and Mack testified that they were required to use a scanner when delivering packages for Velocity. Chambers Depo., ECF No. 242-25 at 13-14; Mack Depo., ECF No. 242-28 at 10-13. Velocity does not dispute that Chambers and Mack were required to use a scanner.

drivers successfully complete a Department of Transportation-required road rest; obtain insurance that complied with Velocity's insurance requirements (at least an A- rating) or, alternatively, enroll in Velocity's insurance program; and undergo a criminal history background check. ECF No. 242-59; Healey Depo., ECF No. 242-16 at 18-20. Velocity penalized drivers who did not meet its insurance requirements by deducting $50 per week from their pay. ECF No. 242-23. Regardless of whether drivers elected to purchase separate insurance or enroll in Velocity's insurance program, they were required to report even minor accidents to Velocity. Wheeler Depo., ECF No. 242-8 at 71-72. In sum, Velocity's policies and procedures allowed Velocity to exercise a great deal of control over the manner in which their drivers performed their jobs.

Defendants respond that Plaintiffs have failed to show that Velocity implemented mandatory rules in the three states where the bellwether Plaintiffs worked—i.e., California, Texas, and Pennsylvania. ECF No. 245 at 18. Specifically, Defendants object to Plaintiffs' reliance on an internal memorandum that only applied to drivers who provided services to Staples in Jersey City. Id.

The Court agrees that the internal memorandum entitled "Driving Metrics" appears to have been directed only at "Jersey City Staples Drivers," and therefore the document itself is not directly relevant to Defendants' right to control the three bellwether Plaintiffs, none of whom worked in New Jersey. ECF No. 242-13 at 2. However, any dispute regarding the relevance of this particular piece of evidence is immaterial given the undisputed evidence regarding Velocity's rules and standard operating procedures that applied to *all* drivers. As explained above, Velocity's own witnesses testified that Velocity had a series of rules that it required drivers to follow when delivering products to customers and that Velocity implemented standard operating procedures for its drivers. Odud Depo., ECF No. 242-7 at 23; Curcuru Depo., ECF No. 242-12 at 59-63.

Moreover, even if this internal memorandum did not apply to the three bellwether Plaintiffs in this case, a Velocity witness affirmed that "Velocity could have implemented a policy like that and it was within its purview as a corporation to implement these type[s] of rules with its drivers . . ." Odud Depo., ECF No. 245-1 at 283-84. Odud further testified that "[Velocity] had the right to—we enforced what we expected of the drivers" and that Velocity had the right to

terminate drivers who did not adhere to a terminal manager's internal rules regarding scanning procedures, uniforms, returns, and customer service.  Id.; ECF No. 242-7 at 24-38.  This goes to the heart of Velocity's right to control how its drivers performed their work, regardless of whether it did in fact exercise that control.  See Alexander, 765 F.3d 981, 994 (9th Cir. 2014) ("Whether FedEx ever exercises its right of refusal is irrelevant; what matters is that the right exists."); Saravia v. Dynamex, Inc., No. C 14-05003 WHA, 2016 WL 5946850, at *3, n. 2 (N.D. Cal. Sept. 30, 2016) (referring to the defendant's conflation of the right to control with the exercise of control throughout its briefs as a "sleight of hand" for which the defendant "cites no authority.").

Defendants also point to evidence suggesting that Plaintiffs had control over certain aspects of their work, such as the ability to deviate from the order of stops listed in their manifest, to turn down routes, to eat lunch between deliveries, and to take vacations without notifying Velocity as long as a substitute driver filled in.  ECF No. 245 at 20, 44, 48.[13]

The Ninth Circuit rejected a similar argument in Slayman and Alexander, noting that, even if FedEx "does not require drivers to follow specific routes or to deliver packages in a specific order," "the right-to-control test does not require absolute control."  Slayman, 765 F.3d at 1043-44; Alexander, 765 F.3d at 990.  The court went on to explain that "FedEx's lack of control over some parts of its drivers' jobs does not counteract the extensive control it does exercise." Alexander, 765 F.3d at 990-91 (explaining that a certain degree of "autonomy" on the part of the worker is not inconsistent with employee status under California law).  In other words, "[i]f an employment relationship exists, the fact that a certain amount of freedom is allowed or is inherent in the nature of the work involved does not change the character of the relationship, particularly where the employer has general supervision and control."  See Narayan v. EGL, Inc., 616 F.3d 895, 904 (9th Cir. 2010) (internal quotation marks omitted).

For example, one California court of appeal held that there was substantial evidence that the plaintiff delivery drivers were employees even though certain drivers "[were] free to decline to perform a particular delivery" and "[were] not required to work either at all or on any particular

_____

[13] The Court discusses the Plaintiffs' investments in their own vehicles and their employment of helpers in a separate section addressing that factor below.

schedule," as long as they "satisf[ied] the general assurances given by [the defendant] to its customers that their packages will reach the appropriate local destination without two to four hours from pick-up." JKH Enterprises, Inc. v. Dep't of Indus. Relations, 142 Cal. App. 4th 1046, 1051 (2006).[14] Courts in this district applying California law have similarly concluded that, even if "drivers are permitted to rearrange the order of their stops on occasion, . . . this limited flexibility is not inconsistent with the conclusion that the degree of control retained by [the defendant] is sufficient to demonstrate an employer-employee relationship." Villalpando, 2015 WL 5179486 at *47.

Courts have reached the same conclusion with respect to an alleged employer's right to control the manner of work under the FLSA:

> The "right to control" does not require continuous monitoring of employees. Instead, control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control "do[ ] not diminish the significance of its existence." "Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity."

Mathis v. Hous. Auth. of Umatilla Cty., 242 F. Supp. 2d 777, 783 (D. Or. 2002) (internal citations omitted). As the Fifth Circuit has explained when applying the right to control factor under FLSA's economic realities test, "the lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence." Usery v. Pilgrim Equip. Co., 527 F.2d 1308, 1312 (5th Cir. 1976).

Therefore, even assuming that Plaintiffs could control certain aspects of their work—i.e., lunch, vacation, which routes they accepted, and whether they delivered packages in the order listed on the manifest—their independence with respect to these minor tasks is not sufficient to establish their economic independence under either FLSA's economic realities test or California's right-to-control test. Velocity retained the right to control "[a]ll meaningful aspects" of its

---

[14] Because the JKH Enterprises case involved a petition for a writ of administrative mandate challenging an administrative order issued by the California Department of Industrial Relations, the court reviewed the Department's decision under the deferential "substantial evidence standard." Id. at 1059. Despite this difference in procedural posture, the Court finds the reasoning in that case instructive in light of the factual overlap.

business, including driver and vehicle appearance, customer service expectations, the timing of work, and how that work was to be performed.  Id.

Given the overwhelming undisputed evidence that Velocity had the right to control key aspects of how drivers' performed their work, this factor strongly favors employee status.

### 5. Drivers' Opportunity for Profit or Loss

If the individual's "opportunity for profit or loss appears to depend more upon the managerial skills of [the alleged employer] . . . than it does upon the [individual's] own judgment and industry," this factor weighs in favor of employee status.  See Real, 603 F.2d at 755.  As the court explained in Collinge, "[t]his factor is relevant because experiencing profit or loss based on one's managerial skill is a characteristic of running an independent business."  Collinge, 2015 WL 1299369 at *4.

The Collinge court found that this factor cut in favor of the plaintiff drivers.  Id.  Although the drivers could "maximize profits by declining relatively low-paying jobs" and "minimize costs by ordering their deliveries efficiently," the court found that their "drivers' ability to increase their profits through such means is limited."  Id.  In reaching this conclusion the court considered that drivers' pay "is capped by what IntelliQuick is willing to pay them" and, even if drivers rearrange the order of their deliveries, "their ability to realize a profit from this opportunity is constrained by the fact that IntelliQuick decides which deliveries appear on their manifests."  Id.  The court concluded that "the drivers' opportunity for profit or loss depends more upon the jobs to which IntelliQuick assigns them than on their own judgment and industry."  Id. at *4.

The undisputed evidence demonstrates that the same is true here.  Velocity's managerial employees testified that Velocity had the ultimate authority to determine drivers' pay.  Odud Depo., ECF No. 242-7 at 7, 22.  They further testified that drivers' pay was capped at a certain percentage of revenue, and that terminal managers were expected to keep drivers' aggregate pay within that percentage.  Id. at 63-67.  Multiple Velocity witnesses also testified that Velocity determined the customer, the rate of pay for a particular route, the stops, and the order of the stops before they even hired a driver to work the route.  Wheeler Depo., ECF No. 242-8 at 67-68; Curcuru Depo., ECF No. 242-12 at 11-12.  Internal emails similarly suggest that Velocity had sole

24

discretion regarding any increase in drivers' pay.  See, e.g., ECF No. 242-36.  And each of the three bellwether Plaintiffs testified that Velocity unilaterally set their rate of pay.  Chambers Depo., ECF No. 242-25 at 24-25, 38 ("[T]hey already had set rates. Like they'll say there are still four stops, this pays this, this and that, add them all up and that's what you get."); Boconvi Depo., ECF No. 242-14 at 64; Mack Depo., ECF No. 242-28 at 42-44.

Defendants suggest that there is a factual dispute as to whether Plaintiffs were able to negotiate pay raises.  ECF No. 245 at 33, 47.  Although some evidence suggests that the Plaintiffs may have been able to negotiate modest pay increases, any dispute in this regard is immaterial.  See, e.g., Healey Depo., ECF No. 242-16 at 44; Chambers Depo., ECF No. 242-25 at 27, 80.  The Collinge court rejected this exact argument, explaining that "one's ability to obtain a discretionary pay raise is not the type of profit-maximizing 'managerial skill' that is characteristic of independent contractor status."  Collinge, 2015 WL 1299369 at *5.  After all, "[e]mployees and independent contractors alike may request pay raises."  Id.  Rather, "[t]he profit-maximizing opportunities that are relevant here are those under the worker's control, not subject to the discretion of the worker's supervisor."  Id.

Defendants also point to Chambers' testimony that he "bought a truck that had double gas tanks," purchased gas in the least expensive cities, did not take routes with high tolls, made himself available to his manager at all hours to get more routes, and accepted as many routes as possible.  Chambers Depo., ECF No. 242-25 at 47-48, 64; Chambers Depo., ECF No. 245-1 at 187-188.  Again, the Collinge court rejected similar arguments.  There, the Defendants argued that drivers could increase their profits by "taking on additional work, or selecting fuel-efficient vehicles."  Collinge, 2015 WL 1299369 at *5.  The court noted that "a worker's ability to simply work more is irrelevant" because "[m]ore work may lead to more revenue, but not necessarily more profit."  Id.  And, "although selecting a fuel-efficient vehicle will likely reduce a driver's costs over the long run, there is little 'managerial skill' involved in that decision."  Id.  The same principles apply with equal force here.  To the extent Chambers' decisions did involve some level of managerial skill, his opportunity for profit still depended far more upon Velocity's managerial skills in negotiating with customers and designing routes than it did upon his decisions to avoid

toll roads and increase fuel efficiency.  See Real, 603 F.2d at 755.

The Court concludes that this factor also weighs in favor of employee status.

### 6. Drivers' Investments in Equipment and Employment of Helpers

When analyzing this factor under the economic realities test, the Ninth Circuit has assessed the alleged employee's investment relative to the alleged employer's investment.  See Real, 603 F.2d at 755 (considering that "the appellants' investment in light equipment hoes, shovels and picking carts is minimal in comparison with the total investment in land, heavy machinery and supplies necessary for growing the strawberries").  Other circuits have taken a similar approach.  See, e.g., Baker v. Flint Eng'g & Const. Co., 137 F.3d 1436, 1442 (10th Cir. 1998) ("In making a finding on this factor, it is appropriate to compare the worker's individual investment to the employer's investment in the overall operation.").[15]

Again, Collinge is instructive because of its factual similarities to this case.  The plaintiff delivery drivers in that case "concede[d] that all drivers must invest in a personal vehicle to make deliveries and some purchase their own scanners."  Collinge, 2015 WL 1299369 at *5.  One plaintiff had also purchased a hand truck and a rubber stamp.  Id.  But the court concluded that "[t]hese investments are insignificant . . . when compared to the total capital investment necessary to operate IntelliQuick's delivery business, including the cost of acquiring and maintain warehouse space, office space, dispatchers, computers, and the CXT software used to coordinate deliveries."  Id.

---

[15] Despite the Ninth Circuit's use of a comparative approach, Defendants cite to a district court case from the Southern District of New York to argue that this comparative approach is "inappropriate."  ECF No. 245 at 37, n. 21.  That decision is not binding on this Court and, in any event, distinguishable.  In that case, the court acknowledged that, "[a]lthough the Second Circuit does not appear to have addressed the issue, there is some authority from courts in this District suggesting that a comparative analysis is appropriate."  Saleem v. Corp. Transp. Grp., Ltd., 52 F. Supp. 3d 526, 540 (S.D.N.Y. 2014), order clarified, No. 12-CV-8450 JMF, 2014 WL 7106442 (S.D.N.Y. Dec. 9, 2014).  The Saleem court ultimately rejected a comparative approach in that case because "it [was] not obvious which party undertook  more economic risk . . . "  Id.  The plaintiff drivers in that case, who worked for "black car" businesses serving corporate clients, "made substantial investments in their businesses."  Id. at 528-29, 540.  In addition to purchasing cars, gasoline, and insurance, the plaintiff drivers in Saleem bought or rented franchises, the price of which "ranges from approximately $20,000 to $60,000."  Id. at 540, 530.  As explained in greater detail below, the Plaintiffs' investments in this case are negligible in comparion, and it is clear that Velocity undertook more economic risk than the Plaintiffs.

Like the drivers in <u>Collinge</u>, Plaintiffs admit that they made some investments in equipment related to their work at Velocity. Specifically, Plaintiff Chambers purchased two box trucks (one $3,000 and one unknown price), uniforms, carrying straps ($40), blankets, tie down straps ($30), and safety equipment like fire extinguishers, extra fuses, flares, and a log book. Chambers Depo., ECF No. 242-25 at 12-14, 43-44, 85-87. Plaintiff Boconvi purchased a used van (less than $10,000), two dollies (less than $300 total), a uniform (less than $50), and an employer identification number (approximately $9). Boconvi Depo., ECF No. 242-14 at 14-17, 29; ECF No. 245-1 at 103.[16] Plaintiff Mack invested in two vans and, a rental truck, and a Velocity shirt. Mack Depo., ECF No. 242-28 at 36-37, 55-56.

However, these investments are minimal when compared to the total capital investment necessary to operate Velocity's business. For example, Velocity "has invested over $20MM in technology solutions" and leases "[o]ver 4.4 million square feet" for its facilities. ECF No. 242-6 at 7, 9; <u>see also</u>, Smith Depo., ECF No. 242-67 at 23. In 2013 alone, Velocity spent more than $2 million on equipment operation costs and almost $8 million on real estate. ECF No. 242-68 at 4-5. As the <u>Collinge</u> court said when analyzing similar facts,

> [A]ll drivers must invest in a personal vehicle to make deliveries and some purchase their own scanners. Further, defendants point out that plaintiff Brian Black ("Black") purchased a hand truck and a rubber stamp. These investments are insignificant, however, when compared to the total capital investment necessary to operate IntelliQuick's delivery business, including the cost of acquiring and maintaining warehouse space, office space, dispatchers, computers, and the CXT software used to coordinate the deliveries.

<u>Collinge</u>, 2015 WL 1299369 at *5. As in that case, because the Plaintiffs themselves did not make such "significant capital investments," their work is lacking yet another "hallmark[] of independent contractor status." <u>Collinge</u>, 2015 WL 1299369 at *6.

Moreover, although both Chambers and Mack hired two helpers each,[17] this "does not

---

[16] Defendants point to evidence that Boconvi purchased an 18-wheeler truck and a trailer in 2010 to perform work for a different company. ECF No. 245 at 23; ECF No. 245-1 at 71. They also point to evidence regarding equipment owned by Gobus Trucking, a company that Boconvi started in March 2016, several years after his employment with Velocity had already ended. ECF No. 245 at 23; ECF No. 245-1 at 74-76. Because Boconvi did not use any of this equipment while working for Velocity, it is not relevant here. ECF No. 245-1 at 88-90.

[17] Boconvi testified that he was unable to use a helper because he couldn't afford it. Boconvi

prevent a finding that they are employees" under the FLSA. <u>Real</u>, 603 F.2d at 755. In fact, the Eleventh Circuit has noted that a worker's ability to hire helpers is "illusory" for purposes of the FLSA if helpers are also subject to the control of the alleged employer. <u>Scantland v. Jeffry Knight, Inc.</u>, 721 F.3d 1308, 1317 (11th Cir. 2013). Similarly, the Ninth Circuit has held that, "where drivers 'retain[] the right to employ others to assist in performing their contractual obligations,' but the company had to approve all helpers, this [i]s indicative of control of the details of the drivers' performance under California law." <u>Alexander</u>, 765 F.3d at 994 (quoting <u>Narayan</u>, 616 F.3d at 902); <u>see also</u>, <u>Ruiz</u>, 754 F.3d at 1102-03 (considering that "[the defendant] retained ultimate discretion to approve or disapprove of those helpers and additional drivers"). This is true even if "approval [i]s largely based upon neutral factors, such as background checks required under federal regulations," because a driver's "unrestricted right to choose these persons . . . is an 'important right[] [that] would normally inure to a self-employed contractor.'" <u>Alexander</u>, 765 F.3d at 994 (quoting <u>Borello</u>, 769 P.2d at 408, n. 9). Based on both <u>Alexander</u> and <u>Ruiz</u>, courts in this district have rejected attempts to manufacture a dispute regarding employee status based on the fact that delivery drivers could hire helpers where it is undisputed that helpers must be approved by the alleged employer and are subject to all the same requirements as drivers. <u>See</u>, <u>e.g.</u>, <u>Villalpando</u>, 2015 WL 5179486, at *48.

It is undisputed that Plaintiffs' helpers had to be approved by Velocity and were subject to the same requirements as drivers. Velocity's contract with its drivers requires that "all Service Employees, including but not limited to Contractor, [and] any substitute drivers, . . . comply with [Velocity's] Substance Abuse Policy and Drivers Qualification Policy, . . . and all like customer qualification requirements." ECF No. 245-1 at 131 ¶ 16. And several Velocity managerial employees testified that Velocity had the right to approve or reject any prospective helpers. Onud Depo., ECF No. 242-7 at 51; Healey Depo., ECF No. 242-16 at 58-61 (testifying that helpers and substitute drivers are required to undergo background checks and drug testing). Velocity's National Driver Services Manager similarly testified that Velocity determined whether a helper

Depo., ECF No. 242-14 at 56-57.

was qualified. Wheeler Depo., ECF No. 242-8 at 85-86. Substitute drivers were subject to a similar vetting process. Id. at 15-16; see also, ECF No. 242-69 at 3 ("Substitute drivers' are vetted through our qualification program and approved to provide services . . . "). Chambers testified that his two helpers "had to be cleared through Velocity" and that Velocity met with the helpers prior to any driving. Chambers Depo., ECF No. 242-25 at 74, 78. He further testified that Velocity could have rejected his helpers. Id. at 95. Mack's wife and son similarly "ha[d] to go through the hiring process." Mack Depo., ECF No. 242-28 at 27-29.

In sum, Plaintiffs' investments were minimal relative to Velocity's investments and Velocity retained ultimate discretion to approve or reject helpers. Therefore, this factor also favors employee status.

### 7. Skill Required to Perform the Work

The Ninth Circuit has repeatedly held that delivery drivers do not need special skills to perform their work. See Alexander, 765 F.3d at 995 (finding that the skill factor favored plaintiffs' classification as employees under California law because "FedEx drivers 'need no experience to get the job in the first place and [the] only required skill is the ability to drive'") (quoting Estrada, 64 Cal. Rptr. 3d at 337); Ruiz, 754 F.3d at 1104 (finding that "the drivers' work did not require substantial skill"). As the Ninth Circuit explained in Ruiz, "in hiring drivers, [defendant] did not require special driving licenses or even any work experience; rather a driver simply had to have a driver's license, sign a work agreement, and pass a physical examination and drug test." Id. California courts and courts in this district have reached the same conclusion. See, e.g., Villalpando, 2015 WL 5179486, at *49 (holding that "an individual needs no special skills to be hired as a driver for [defendant]," but rather "[a]ll that is required is that an individual be at least 21 years old, pass a physical examination and drug test, undergo a criminal background check, and have a clean driving record"); JKH Enterprises, Inc., 142 Cal. App. 4th at 1064 ("[T]he functions performed by the drivers, pick-up and delivery of papers or packages and driving in between, did not require a high degree of skill.").

The same is true here. An individual does not need to have any particular level of education, specialized training, or special license to be a driver for Velocity. Healey Depo., ECF

No. 242-16 at 36-37. Rather, they just need to meet the minimum age requirements, have a car and a valid driver's license, speak English, and pass background and drug screens. Odud Depo., ECF No. 242-7 at 126-128; see also, ECF No. 242-34 at 3 ("To be an Independent Contractor you must: [b]e 21 years of age; [o]wn a cargo van, a 14-16 Box Truck or 24-26 Box Truck with lift gate; [and] [p]ass all background and drug screens.").

Because Plaintiffs' services do not require a special skill, this factor further weighs in favor of employee status.

### 8. Duration of Services and Permanence of Working Relationship

When applying this factor under the FLSA, the Ninth Circuit has considered the following factors: whether the worker "continuously" provided services to the alleged employer for a "long period[] of time"; whether the worker had "a fixed employment period"; and whether the worker "offer[ed] their services to different employers." Torres-Lopez v. May, 111 F.3d 633, 644 (9th Cir. 1997); Donovan v. Sureway Cleaners, 656 F.2d 1368, 1372 (9th Cir. 1981).

California courts consider "the length of time for which the services are to be performed." Alexander, 765 F.3d at 988-99 (quoting Borello, 769 P.2d at 407). And the California Supreme Court has held that "[s]trong evidence in support of an employment relationship is the right to discharge at will, without cause." Borello, 48 Cal. 3d at 350 (internal quotation marks and citations omitted). If an agreement contains "automatic renewal clauses" and "could be terminated by either party upon thirty-days notice or upon breach of the agreement," that "is a substantial indicator of an at-will employment relationship." Narayan, 616 F.3d 895, 902-03 (9th Cir. 2010).

Each of the bellwether Plaintiffs provided services to Velocity pursuant to a contract with a monthly term that automatically renewed and that did not specify an end date. ECF No. 242-78 at 1 (Boconvi's agreement); ECF No. 242-27 at 1 (Chambers' agreement); ECF No. 242-30 at 3 (Mack's agreement). The agreement could be terminated by either party for any reason with fourteen days of notice, or it could be terminated immediately by either party if there was a breach of the agreement. ECF No. 242-78 at 5. Velocity could also terminate the agreement with only five days of notice to the driver if it determined that the route was no longer profitable. Id. The agreement suggests permanency in that it does not include a fixed employment period and

automatically renews.  However, "the parties' mutual termination provision is consistent with either an employer-employee or independent contractor relationship."  Ruiz, 754 F.3d at 1105.

Other evidence suggests that Plaintiffs had a long-term, permanent working relationship with Velocity.  For example, Chambers worked for Velocity for approximately a year or a year and a half, during which time his routes typically ran Monday through Friday for between twelve and a half to fourteen hours each day.  ECF No. 242-25 at 82, 29.  Chambers further testified that the majority of his income came through his contract with Velocity, that his work with Velocity "kept [him] the busiest," and that it was "hard" to enter into a contract with another company because "you're driving so many hours a day and you get back, get a little bit of rest and you're gone again."  Id. at 45-47.  Mack worked for Velocity for five years, five or six days a week, depending on the time of year, from approximately 4:00am until 7:00pm.  Mack Depo., ECF No. 242-28 at 61-63, 21-24.  Mack testified that he only started looking for another job because he thought the company was going out of business.  Id. at 31.  Besides some overlap with other companies at the beginning and end of his time at Velocity, Mack testified that he did not work for any other company, that all of his income came from Velocity, and that he "didn't have enough time" to work for another company.  Id. at 37-38.  Boconvi testified that he worked exclusively for Velocity, with hours that ranged between 6:00am and 8:00pm or 9:00pm, and sometimes as late as 10:15pm.  Boconvi Depo., ECF No. 242-14 at 1-2, 4-6, 9, 49-50.[18]  He further testified that he stopped working at Velocity because he had a transmission problem with his van and did not have

---

[18] Defendants argue that contradictions between Mr. Boconvi's deposition testimony and his questionnaire responses "raise[] serious issues regarding his credibility . . . " that "should, by themselves, preclude summary adjudication."  ECF No. 245 at 26, 44, n. 24.  Although there are some discrepancies between Mr. Boconvi's deposition testimony and his questionnaire responses, those discrepancies are minor and relate to factual issues that do not materially impact his employment status under the economic reality test.  For example, whether Mr. Boconvi worked between twelve and fourteen hours per day for Velocity, as he responded in his questionnaire, or between fourteen and sixteen hours per day, as he testified at his deposition, does not materially impact his employment status under the FLSA.  ECF No. 245-1 at 145; Boconvi Depo., ECF No. 245-1 at 112.  Nor does it matter whether his route was 200 miles long or, alternatively, between 300 and 400 miles long.  Id.  Finally, given the overwhelming undisputed evidence that Velocity controlled key aspects of when and how its drivers performed their work, it is also immaterial whether Mr. Boconvi sorted boxes or reordered the sequence of his deliveries after the first two weeks.  Id. at 98-99, 110-11, 146, 155.  Again, Velocity does not need to have absolute control over every aspect of delivery drivers' work to be considered an employer under the FLSA.  See Part III.C.4.

31

1  enough money to repair it.  Id. at 63.

2        However, Defendants have pointed to some facts from which a jury could reasonably infer

3  that the Plaintiffs did not have a permanent, long-term working relationship with Velocity.  Most

4  significantly, Boconvi only worked for Velocity for six weeks.  Boconvi Depo., ECF No. 242-14

5  at 1-2, 4-6, 9, 49-50.  And Chambers testified that he sometimes performed "freelance" work for

6  individuals on the side while he was working for Velocity, such as moving a couch.  ECF No.

7  242-25 at 45-46, 57.  Mack also admitted that he had a two-month overlap with his previous

8  company at the beginning of his employment with Velocity, and that he did a few short-term

9  assignments for other companies during his last three months of employment with Velocity.  Mack

10  Depo., ECF No. 242-28 at 1-2, 32.  Boconvi's short term of employment and the other Plaintiffs'

11  testimony regarding a lack of exclusivity reasonably suggest that the Plaintiffs were independent

12  contractors, not employees.  See Torres-Lopez, 111 F.3d at 644 (finding that "there was no

13  'permanence of the working relationship' under the FLSA where the plaintiff farmworkers "only

14  harvested for [the defendant] for thirty-two days"); Donovan, 656 F.2d at 1372 ("[T]rue

15  independent contractors . . . generally offer their services to different employers.").

16        A reasonable jury could conclude that this factor favors independent contractor status.

17            **9.  Plaintiffs' Services are an Integral Part of Velocity's Business**

18        California law considers "whether or not the work is part of the regular business of the

19  principal."  Ruiz, 754 F.3d at 1100 (quoting Borello, 769 P.2d at 407).  Using slightly different

20  wording, the FLSA economic reality test similarly considers "whether the service rendered is an

21  integral part of the alleged employer's business."  Real, 603 F.2d at 754.  If the workers play an

22  integral role in the alleged employer's business, this "shows that the arrangement follows more

23  closely that of an employer-employee relationship than an independent contractor dynamic."

24  Scantland, 721 F.3d at 1319.

25        The work that Plaintiffs performed for Velocity is undoubtedly an integral part of

26  Velocity's regular business.  In its standard services proposal to its customers, Velocity describes

27  itself as "America's largest national ground shipping provider dedicated exclusively to regional

28  delivery."  ECF No. 242-6 at 2.  And Velocity's managerial employees similarly characterized

Velocity as a delivery business. Curcuru Depo., ECF No. 242-12 at 70-71 (characterizing Velocity's business as "[d]elivering product to the end user"); Healey Depo., ECF No. 242-16 at 4-5 (affirming that "the general operation of [Velocity] is just to move products from one destination to the next destination"). Therefore, like in Alexander, the work that Plaintiffs perform for Velocity is "essential to [its] core business." Alexander, 765 F.3d at 996 (internal quotation marks omitted) (quoting Estrada, 64 Cal. Rptr. 3d at 334); see also, Ruiz, 754 F.3d at 1105 ("Without drivers, [defendant] could not be in the home delivery business.").

This factor suggests that Plaintiffs are employees, not independent contractors.

### 10. Totality of the Circumstances[19]

In sum, the significant undisputed evidence shows that Velocity had the right to control key aspects of the manner and details of Plaintiffs' work, that Plaintiffs were unable to obtain profit or suffer loss based on their own managerial skills, that Plaintiffs made minimal investments in equipment relative to Velocity's significant capital investments, that Velocity had ultimate discretion to approve or reject helpers, that Plaintiffs' work does not require any special skill, and that Plaintiffs' services play an integral role in Velocity's regular business. Even assuming all factual inferences in favor of Defendants, only one factor under FLSA's economic reality test and California's right-to-control test could reasonably suggest that any of the three bellwether Plaintiffs were independent contractors and not employees.

Under California law, "[e]ven if one or two of the individual factors might suggest an [independent contractor] relationship, summary judgment is nevertheless proper when ... all the factors weighed and considered as a whole establish ... an [employment] and not an [independent contractor relationship.]" Alexander, 765 F.3d at 988 (quoting Arnold v. Mut. of Omaha Ins. Co., 135 Cal.Rptr.3d 213, 221 (2011)). Moreover, "the right to control work details is the *most important or most significant* consideration," and that factor clearly favors employee status in this case. Ruiz, 754 F.3d at 1100 (quoting Borello, 769 P.2d at 407) (emphasis in original). In both

---

[19] The Court concludes that any evidence regarding the remaining secondary factors under California law is insufficient to defeat summary judgment as to the Plaintiffs' employee status, and accordingly does not analyze those factors. See Villalpando, 2015 WL 5179486 at *49.

Ruiz and Alexander, which are factually very similar to this case, the Ninth Circuit held that the plaintiff drivers were employees as a matter of law because "the arrow pointed so strongly in the direction of one status or the other that no reasonable juror could have pointed the arrow in the opposite direction after applying California's multi-factor test." Cotter v. Lyft, Inc., 60 F. Supp. 3d 1067, 1078 (N.D. Cal. 2015). Similarly, here, "only a single inference and one conclusion may be drawn" from the evidence as a whole. Id. Because Defendants have not presented sufficient evidence to meet their burden at trial, the Court grants Plaintiffs motion for partial summary judgment and holds that Mack is an employee under California law.

The Court also concludes that each bellwether Plaintiff was an employee as a matter of law under the FLSA. As explained above, Defendants have failed to raise a genuine dispute of material fact as to five of the six factors under the economic reality test, and therefore summary adjudication is appropriate as to those factors. Moreover, because the overwhelming uncontroverted evidence shows that each of the Plaintiffs were dependent upon Velocity as a matter of economic reality, no jury could reasonably conclude that the Plaintiffs were independent contractors under the FLSA.

### D. Willfulness

Plaintiffs also move for partial summary judgment as to whether Defendants' misclassification was willful. ECF No. 241 at 50.

Civil enforcement actions under the FLSA must generally be commenced within the two-year statute of limitation. 29 U.S.C. § 255(a). However, "a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." Id. "[T]he party claiming an exception to the normal period bears the burden of showing the violation was willful in order to trigger the extended three-year period." Nelson v. Waste Mgmt. of Alameda Cty., Inc., 33 F. App'x 273, 274 (9th Cir. 2002).

To obtain the benefit of the three-year exception, a plaintiff must show "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 135 (1988). A violation of the FLSA is not willful merely because the employer knew that the FLSA existed and potentially

governed the employer's conduct. Id. at 132-33. Nor is it sufficient to show that "the employer, recognizing it might be covered by the FLSA, acted without a reasonable basis for believing that it was complying with the statute." Id. at 134-35 (internal quotation marks omitted). In other words, "[m]ere negligence by the employer in determining its legal obligation is not sufficient; there must be evidence that the employer affirmatively knew it was violating the FLSA or that it was acting with 'reckless disregard' of the FLSA." Nelson, 33 F. App'x 273, 274 (quoting McLaughlin, 486 U.S. at 133, 135, n. 13).

"All of the facts and circumstances surrounding the violation shall be taken into account in determining whether a violation was willful." 29 C.F.R. § 578.3(c)(1). However, "an employer's conduct shall be deemed to be in reckless disregard of the requirements of the Act, among other situations, if the employer should have inquired further into whether its conduct was in compliance with the Act, and failed to make adequate further inquiry." 29 C.F.R. § 578.3(c)(3). An employer's "former FLSA violations" are also "probative" of willfulness, "even if they were different in kind from the instant [FLSA violation] and not found to be willful." Chao v. A-One Med. Servs. Inc., 346 F.3d 908, 919 (9th Cir. 2003). In Chao, the Ninth Circuit explained that "[t]he fact that [the employer] previously had run-ins with the Labor Department certainly put [the employer] on notice of other potential FLSA requirements." Id. The court concluded that, "[o]ne's prior FLSA violations, especially when combined with the undisputed testimony of the former employees, prove, at the very least, reckless disregard on the part of [the employer] . . ." Id. The Ninth Circuit accordingly held that the district court properly applied the three-year statute of limitations. Id.

Here, Plaintiffs point to evidence showing that the Defendants in this case had run-ins with multiple state regulatory agencies regarding the misclassification of their drivers and were involved in extensive litigation regarding the same issue. In 2008, the Judicial Panel on Multidistrict Litigation consolidated eight different actions against Velocity that "share[d] factual questions arising from the classification of certain package delivery drivers as independent contractors rather than employees." ECF No. 244-78. TransForce and Dynamex also knew when they acquired Velocity in 2012 that there was a significant litigation risk related to this issue.

Leveridge Depo., ECF No. 242-11 at 5-7; Langlois Depo., ECF No. 242-71 at 1-5; Smith Depo., ECF No. 244-68 at 8; ECF No. 244-77 at 3, 54 (noting that "the issue of I/C vs Employee Status is one risk that they have to deal with on a regular basis" and that "the IC vs Employee issue is a major risk for the company"). Specifically, Velocity's disclosures revealed that Velocity was appealing two decisions in which state regulatory boards in New York and Washington concluded that Velocity's drivers were employees, not independent contractors, for the purpose of state unemployment and workers' compensation, respectively. Langlois Depo., ECF No. 242-71 at 6-17; see also, ECF No. 242-73 (disclosing pending litigation). The Washington decision prompted an audit by the Washington State Department of Labor and Industries. ECF No. 242-73 at 2-3. Defendants also knew that there was a pending collective action against Velocity in the Northern District of California. See Smith Depo., ECF No. 244-68 at 1-4, 15; Langlois Depo., ECF No. 242-71 at 16-17; ECF No. 242-73 at 2 (disclosing "[c]ollective/class action instituted by two IC drivers . . . alleging Fair Labor Standards violations in conjunction with misclassification as independent contractors"). Given Defendants' numerous run-ins with regulatory agencies and extensive litigation regarding the misclassification issue, Defendants "should have inquired further into whether [their] conduct was in compliance with the Act . . ." 29 C.F.R. § 578.3(c)(3).

Despite having such inquiry notice, Defendants fail to point to any evidence in the record showing that they took affirmative action to assure compliance with FLSA's requirements. See Flores v. City of San Gabriel, 824 F.3d 890, 906 (9th Cir. 2016); Alvarez v. IBP, Inc., 339 F.3d 894, 909 (9th Cir. 2003), aff'd, 546 U.S. 21 (2005) (affirming the district court's conclusion that the defendant acted willfully where "[the defendant] was on notice of its FLSA requirements, yet took no affirmative action to assure compliance with them"). Instead, Defendants argue that they complied with the FLSA in good faith and point to decisions in which courts and agencies found that their drivers were properly classified as independent contractors. ECF No. 245 at 52-54.[20]

As an initial matter, although Defendants represent that "[t]he FLSA provides companies

_____

[20] Pursuant to Defendants' request, the Court takes judicial notice of those cases and agency decisions under Federal Rule of Evidence 201 because they include documents that are already in the public record. See ECF No. 246; Mendia v. Garcia, 165 F. Supp. 3d 861, 872 (N.D. Cal. 2016); Duckett v. Gondinez, 67 F.3d 734, 741 (9th Cir. 1995).

with a good faith defense to a finding of willfulness," the good faith defense in 29 U.S.C. Section 260 is actually a defense to an award of liquidated damages. Flores, 824 F.3d at 895–96 ("The Act provides a defense to liquidated damages for an employer who establishes that it acted in good faith and had reasonable grounds to believe that its actions did not violate the FLSA.") (citing 29 U.S.C. § 260)). Section 260 provides that, "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act . . . , the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title." 29 U.S.C. § 260.

Nevertheless, the Court addresses Defendants' good faith argument because "a finding of good faith is plainly inconsistent with a finding of willfulness." Chao, 346 F.3d at 920 (citing Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1130 (9th Cir. 2002)). "To avail itself of this defense, the employer must establish that it had an honest intention to ascertain and follow the dictates of the Act and that it had reasonable grounds for believing that its conduct complied with the Act." Flores, 824 F.3d at 905 (internal quotation marks and brackets omitted). In other words, "a FLSA-liable employer bears the 'difficult' burden of proving both subjective good faith and objective reasonableness." Alvarez., 339 F.3d at 910 (quoting Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 142 (2d Cir. 1999)). "An employer who failed to take the steps necessary to ensure its practices complied with FLSA and who offers no evidence to show that it *actively endeavored* to ensure such compliance has not satisfied § 260's heavy burden." Flores, 824 F.3d at 905 (internal quotation marks and brackets omitted) (emphasis in original) (quoting Alvarez, 339 F.3d at 910).

Defendants have not met that "heavy burden" here. Flores, 824 F.3d at 905. Even assuming that the judicially noticed decisions provided Defendants with objectively reasonable grounds for believing that their conduct complied with the FLSA,[21] Defendants have not pointed

---

[21] The Court notes that only one of the judicially-noticed decisions actually dealt with misclassification under the FLSA. ECF No. 246. The remainder address employment status for purposes of California's Fair Employment Housing Act ("FEHA"), vicarious tort liability under New York law, and state unemployment insurance benefits. Id.

to any evidence in the record suggesting that they acted in subjective good faith—i.e., that they "had an honest intention to ascertain and follow the dictates of the Act." Id. Nor have they pointed to any evidence "to show that [they] actively endeavored to ensure such compliance." Alvarez, 339 F.3d at 910. Rather, like the defendant in Alvarez, Defendants are "[m]istaking ex post explanation and justification for the necessary affirmative 'steps' to ensure compliance." Id. Absent any evidence that they took affirmative steps to ensure compliance with the FLSA, Defendants have not satisfied Section 260's good faith defense. Flores, 824 F.3d at 905.

In sum, although Defendants should have inquired further to determine whether the classification of their drivers as independent contractors complied with the FLSA, they failed to take any affirmative steps to ensure compliance. At the very least, they acted in reckless disregard of whether their driver classification system complied with the FLSA. Therefore, Plaintiffs are entitled to the benefit of the three-year statute of limitations.

## CONCLUSION

The Court grants Plaintiffs' motion for partial summary judgment in its entirety.

**IT IS SO ORDERED.**

Dated: April 24, 2017

_____
JON S. TIGAR
United States District Judge