Timothy J. Becker (MN Bar No. 256663)
tbecker@johnsonbecker.com
Jacob R. Rusch (MN Bar No. 391892)
jrusch@johnsonbecker.com
JOHNSON BECKER, PLLC
444 Cedar Street, Suite 1800
St. Paul, Minnesota 55101
Telephone: (612) 436-1800
Fax: (612) 436-1801

*Trial Counsel for Plaintiffs*

(Additional Counsel Listed On Signature Page)

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

PHILLIP FLORES and DARAH DOUNG, individually and on behalf of all similarly situated individuals,

Plaintiffs,

v.

TFI INTERNATIONAL INC., a Foreign Corporation, F/K/A TRANSFORCE INC., a Foreign Corporation, and TFORCE FINAL MILE, LLC, a Foreign Limited Liability Company, F/K/A TF FINAL MILE, LLC, a Foreign Limited Liability Company, F/K/A DYNAMEX OPERATIONS EAST, LLC, a Foreign Limited Liability Company, F/K/A DYNAMEX OPERATIONS EAST, INC., a Foreign Corporation,

Defendants,

Case No. 3:12-cv-05790-JST

*Assigned for all purposes to the Honorable Jon S. Tigar*

**NOTICE OF UNOPPOSED MOTION FOR APPROVAL OF JOINT STIPULATION OF SETTLEMENT; ATTORNEYS' FEES AND COSTS; MEMORANDUM IN SUPPORT**

***This Document Relates to All Cases.***

| | |
|---|---|
| Complaint Filed: | November 9, 2012 |
| Date: | November 15, 2018 |
| Time: | 2:00 p.m. |
| Courtroom: | 9 – 19th Floor |

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

OTHER AUTHORITIES ...................................................................................................v

NOTICE OF UNOPPOSED MOTION FOR APPROVAL OF JOINT STIPULATION ............1

I.  BACKGROUND OF THE LITIGATION TO DATE ................................................2

    A.  *The Wage-and-Hour Claims* ........................................................................2

    B.  *Discovery and Motion Practice* ...................................................................2

        1.  *Round One—Bellwether Trials for CMO No. 2 and Summary Judgment* .................3

        2.  *Round Two—Tranche 1* ....................................................................4

    C.  *Three Separate Mediation Sessions and Resolution* ........................................5

II.  THE PROPOSED SETTLEMENT ........................................................................5

    A.  *An Overview of the MSA's Terms and Conditions Including the Claim Share and Allocation Plan* ............................................................................................6

    B.  *Participating Drivers' Rights and Privileges* ..................................................7

    C.  *Implementation of the Settlement, Withdraw Right, and the Effective Date* .................10

ARGUMENT ................................................................................................................11

I.  THE JOINT SETTLEMENT COMPORTS WITH THE REQUIREMENTS OF *LYNN'S FOODS* ....................................................................................................12

    A.  *The Settlement is a Direct Result of Vigorously Contested Litigation* ....................12

    B.  *The Settlement is a Fair and Reasonable Resolution of a Bona Fide Dispute* .............13

        1.  *The Plaintiffs' range of possible recovery* ............................................13

        2.  *The stage of proceedings and amount of discovery completed* ....................14

        3.  *The seriousness of the litigation risks faced by the parties* .......................15

        4.  *The scope of any release provision in the settlement agreement* ..................16

        5.  *The experience and views of counsel and the opinion of participating plaintiffs* ....17

        6.  *The possibility of fraud or collusion* ..................................................18

**II.   THE COURT SHOULD APPROVE THE PROCESS TO ADJUDICAT THE CLAIMS OF ABSENTEE DRIVERS**.................................................................................19

**III.  PLAINTIFFS' REMAINING ATTORNEYS' FEES AND COSTS ARE REASONABLE**..........................................................................................................21

*A.   Plaintiffs are Entitled to Attorneys' Fees and Costs Under the FLSA and the Court Should Use the Lodestar Method to Determine the Reasonableness of Attorneys' Fees Not Subsumed Within the May 17, 2018 Order*..............................23

*B.   Plaintiffs' Counsel's Requested Lodestar Not Subsumed in the May 17, 2018 Order is Reasonable*...........................................................................................24

    *1.   Work performed that was removed from the original fee petition*.........................24

    *2.   Continued litigation of the Action*........................................................25

**CONCLUSION**.........................................................................................................25

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

*Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728 (1981) .................................................11

4

*Blum v. Stenson*, 465 U.S. 886 (1984) ..............................................................................................21

5

6

*Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983), *abrogated on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985) ...............................22

7

*Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 532 U.S. 598 (2001)..................................................................................................................................................24

8

9

*Ching v. Siemens Industry, Inc.*, No. 11-cv-04838-MEJ, 2014 WL 2926210 (N.D. Cal. June 27, 2014) .........................................................................................................................................................15

10

*City P'ship Co. v. Atl. Acquisition Ltd. P'ship.*, 100 F.3d 1041 (1st Cir. 1996)................................18

11

12

*Dunn v. Teachers Ins. & Annuity Ass'n of Am.*, No. 13-cv-05456-HSG, 2016 WL 153266 (N.D. Cal. Jan. 13, 2016) .........................................................................................................................................23

13

*Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015 (9th Cir. 2012) .............................................22

14

15

*Fulton v. TLC Lawn Care, Inc.*, No. 10-cv-2645-KHV, 2012 WL 1788140 (D. Kan. May 17, 2012) .........................................................................................................................................................21

16

17

*Gamble v. Boyd Gaming Corp.*, No. 2:13-cv-01009-JCM-PAL, 2015 U.S. Dist. LEXIS 107279 (D. Nev. Aug. 13, 2015)........................................................................................................................21

18

*Gambrell v. Weber Carpet, Inc.*, No. 10-2131-KHV, 2012 WL 162403 (D. Kan. Jan. 19, 2012)....................................................................................................................................................21

19

20

*Gonzalez v. Fallanghina, LLC*, Case No. 16-cv-1832-MEJ, 2017 WL 1374582 (N.D. Cal. Apr. 17, 2017) .............................................................................................................................................11, 13

21

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) .....................................................................................21

22

23

*Holyfield v. F.P. Quinn & Co.*, No. 90 C 507, 1991 U.S. Dist. LEXIS 5293, 1991 WL 65928 (N.D. Ill. Apr. 22, 1991) ..............................................................................................................................22

24

*Howe v. Hoffman-Curtis Partners Ltd., LLP*, 215 Fed. Appx. 341 (5th Cir. 2007) ...........................22

25

*James v. Wash Depot Holdings, Inc.*, 489 F. Supp. 2d 1341 (S.D. Fl. May 14, 2007) ......................21

26

27

*Jennings v. Open Door Marketing, LLC*, Case No. 15-cv-04080-KAW, 2018 WL 4773057 (N.D. Cal. Oct. 3, 2018) ................................................................................................................... 14-17

28

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234 (9th Cir. 1998) ........................................15

*Lucio-Cantu v. Vela*, 239 Fed. Appx. 866 (5th Cir. 2007) ....................................................21

*Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350 (11th Cir. 1982)................................. 11-12

*Mendoza v. Valley Park Apartments, Inc*., No. 13-cv-00002-PAB-KMT, 2014 WL 984687 (D. Colo. Mar. 13, 2014)................................................................................................21

*Newhouse v. Robert's Ilima Tours, Inc*., 708 F.2d 436 (9th Cir. 1983). .....................................23

*Otey v. Crowdflower, Inc*., Case No. 12-cv-5524-JST, 2015 WL 6091741 (N.D. Cal. Oct. 16, 2015) ..............................................................................................................11, 24

*Rodriguez v. W. Publ'g Corp*., 563 F.3d 948 (9th Cir. 2009)...........................................15, 17

*Selk v. Pioneers Mem'l Healthcare Dist*., 159 F. Supp. 3d 1164 (S.D. Cal. 2016)................15, 16, 18

*Slezak v. City of Palo Alto*, Case No. 16-cv-3224-LHK, 2017 WL 2688224 (N.D. Cal. June 22, 2017) ...................................................................................................... *passim*

*Thomas v. California Victim Comp. Program*, No. 16-cv-07653-JLS-RAO, 2017 WL 1508558 (C.D. Cal. Mar. 13, 2017), *report and recommendation adopted*, No. 16-cv-07653-JLS-RAO, 2017 WL 1505590 (C.D. Cal. Apr. 24, 2017).............................................................................20

*Thompson v. Costco Wholesale Corp., No. 14-cv-2778-CAB-WVG, 2017 WL 1957552, at *9 (S.D. Cal. May 11, 2017)* .....................................................................................20-21

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1047, 194 L. Ed. 2d 124 (2016)........................14

*Wales v. Jack M. Berry, Inc*., 192 F. Supp. 2d 1313 (M.D. Fl. Dec. 21, 2001).................................21

*Woolley v. Ygrene Energy Fund, Inc., No. 17-cv-01258-LB, 2018 WL 558938* (N.D. Cal. Jan. 25, 2018) ................................................................................................................21

*Wright v. U-Let-Us Skycap Servs., Inc*., 648 F.Supp. 1216 (D. Colo. 1986).......................................21

1    **OTHER AUTHORITIES**

2    Fair Labor Standards Act, 29 U.S.C. § 216(6)...........................................................................2, 12, 23

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>NOTICE OF UNOPPOSED MOTION FOR APPROVAL OF JOINT STIPULATION</u>**

PLEASE TAKE NOTICE that on November 15, 2018, at 2:00 p.m., at the San Francisco Courthouse, Courtroom 9 – 19th Floor, Plaintiffs Philip Flores and Darah Doung (collectively with the Opt-in Plaintiffs, "Plaintiffs") will move this Court for an Order Granting Plaintiffs' Unopposed Motion for Approval of Joint Stipulation of Settlement, and Attorneys' Fees and Costs against TFI INTERNATIONAL INC., a Foreign Corporation, F/K/A TRANSFORCE INC., a Foreign Corporation, and TFORCE FINAL MILE, LLC, a Foreign Limited Liability Company, F/K/A TF FINAL MILE, LLC, a Foreign Limited Liability Company, F/K/A DYNAMEX OPERATIONS EAST, LLC, a Foreign Limited Liability Company, F/K/A DYNAMEX OPERATIONS EAST, INC., a *Foreign* Corporation (collectively, "Defendants").

Plaintiffs are 367 Courier Drivers who delivered parcels for Defendants throughout the United States. The Parties hereby request preliminary approval of a $4,750,000 Settlement of all claims related to this action. The Master Settlement Agreement ("MSA" or "Settlement") has no claims made process and no reversion.[1] *See generally Master Settlement Agreement* attached to the Declaration of Jacob Rusch ("*Rusch Dec.*") as Exhibit A. Specifically, as set forth in Exhibit B of the MSA, the Settlement contemplates that each Driver receive an award based on the individual number of weeks of service.[2] Those Drivers who elect to participate merely need to consent to the Settlement (i.e., release Defendants from any future litigation related to the claims plead in the operative Complaint), whereas Drivers who elect not to participate retain the right to pursue their individual claims.[3] *See*

---

[1] While there is no reversion for uncollected funds, the MSA does entitle Defendants to a ratchet back the Settlement Share for any Driver who opts not to participate in the Settlement and continues to litigate. As set forth in detail below, Settlement awards in this case are for the individual driver. As such, each driver is entitled to make an individual determination to participate in the Settlement (and accept their individual share) or elect not to participate in the Settlement and continue to litigate.

[2] By agreement of the Parties, Exhibit B to the MSA is provide for in camera review.

[3] The MSA contains a Participation Rate clause (*see Rusch Dec.*, Exhibit A at 7). The Participation Rate clause requires Defendants to fund the Settlement assuming a certain number of Plaintiffs opt to participate in the Settlement. If the Participation Rate is satisfied, the MSA requires Defendant to fund the Settlement. If the Participation Rate is not satisfied, Defendants retain the option to fund the deal

*Plaintiffs' Total Individual Workweeks* attached to *Rusch Dec.* as Exhibit B. Plaintiffs make this motion on the grounds that the Settlement is fair, adequate, and reasonable and within the range of possible final approval. In addition, the Parties jointly request the Court approve the procedure to Adjudicate the Claims of Absentee Drivers as set forth below.

## I.    BACKGROUND OF THE LITIGATION TO DATE.

### A.    *The Wage-and-Hour Claims.*

For the last six years, Plaintiffs' Counsel litigated this case to enforce Plaintiffs' rights provided by the Fair Labor Standards Act, 29 U.S.C. § 216(b) ("FLSA") and California law. Plaintiffs filed this FLSA case seeking recovery for Defendants' alleged willful misclassification of delivery drivers as independent contractors throughout the United States. *See* Dkt. No. 1. Additionally, Plaintiffs brought claims alleging violations of California Law. *See Fourth Amended Complaint*, Dkt No. 140.

Plaintiffs' Counsel's work in this case began in 2012 by investigating the viability of Named-Plaintiff Philip Flores's and Darah Doung's claims. Classifying Plaintiffs as independent contractors, Defendants did not pay overtime for hours worked in excess of 40 hours per week, or daily overtime as required by California law. Nor did Defendants reimburse California Plaintiffs for mileage. At this point, Plaintiffs' Counsel drafted a complaint against Defendants—later filed on November 9, 2012. *See* Dkt. No. 1. In the months that followed, Plaintiffs' Counsel prepared and filed a motion for conditional certification on February 26, 2013. *See* Dkt. Nos. 26 & 27. The Court granted conditional certification on June 3, 2013 (*see* Dkt. No. 57), allowing a 90-day Notice Period resulting in the addition of approximately 650 Opt-in Plaintiffs. Defendants vigorously denied any and all liability resulting from its classification scheme.

### B.    *Discovery and Motion Practice.*

After numerous meet-and-confers with Defense Counsel, the Parties bi-furcated this case into

---

(*id.* at 12). Irrespective of the number of Participating Drivers, if Plaintiffs satisfy either the Participation Rate threshold *or* Defendants agree to fund the Settlement notwithstanding the fact Plaintiffs failed to achieve the Participation Rate, *the individual claims* of Non-Participating Drivers are expressly preserved and remain unaffected by the Settlement. In short, 100% of the Drivers' claims for Participating Drivers will be paid directly to the drivers and not returned to Defendants. *Id.*

two separate tracks. First, Plaintiffs would be required to prove that TransForce and/or Dynamex were successors in liability to Velocity Express.[4] Second, if Plaintiffs prevailed, Plaintiffs were required to prove the Named- and Opt-in Plaintiffs were misclassified as independent contractors. On June 25, 2014, the Parties filed a joint case management statement outlining the extensive discovery already completed and stipulating to the production of custodial files and non-custodial documents for review. *See* Dkt. Nos. 135 & 139. Defendants first produced documents as to successor liability on May 12, 2014, and finished their production on November 7, 2014. Plaintiffs reviewed over 15,000 pages of complex merger and acquisition documents, settlement reports, and emails. Plaintiffs also conducted seven depositions of Defendants' current and former employees in San Francisco and Montreal, Quebec, Canada. Based on the resulting Record, the Court granted Plaintiffs' motion, finding Dynamex is a successor to Velocity Express's potential liability. *See* Dkt. No. 156 & 176. The case then proceeded to the question of misclassification.

       1.    *Round One—Bellwether Trials for CMO No. 2 and Summary Judgment.*

On September 24, 2015, the Court approved the Plaintiff Questionnaire ("PQ") process outlined Case Management Order ("CMO") No. 1 and the discovery plan and bellwether trial process in CMO No. 2. *See* Dkt. Nos. 186-88. At this point, Plaintiffs were no longer collectively litigating their claims or proceeding with a class action; rather, each Plaintiff—through stipulation of the Parties—was litigating their claims on an individual basis. Thus, the resulting Case Pool ultimately consisted of six individuals. Pursuant to CMO No. 2, Defendants identified James Mack as its bellwether trial selection. *See* Dkt. No. 224. Claude Boconvi was selected by Plaintiffs' Counsel as its bellwether trial selection. *See* Dkt. No. 226. The Court selected Charles Chambers as the third bellwether trial selection1. *See* Dkt. No. 237.[5]

To effectively litigate the claims at issue in this case and to fully and adequately prepare for

---

[4]  As the Court is aware, Dynamex purchased Velocity Express in early 2013 and later ceased Velocity Express's operations as an independent entity on December 31, 2013.

[5]  After the Court's selection, Chambers declined to try his case in San Francisco and was voluntarily dismissed on Defendants' Motion. *See* Dkt. No. 291.

dispositive briefing, Plaintiffs requested, reviewed, and analyzed over one million pages of documents and data, which included:

- Payment History data and Settlement Reports reflecting the total number of weeks worked—and the amounts paid by Defendants—for each Opt-in Plaintiff;

- Personnel files for Plaintiffs and Opt-in Plaintiffs;

- COPS data analysis sampling (including scan time, addresses, and routes) for the Case Pool selections; and

- Emails and documents from multiple current and former employees of Defendants.

Plaintiffs also retained an expert, Dr. Jerome Sherman, to review, organize, and understand the data for purposes of dispositive motion practice, trial, and damages.

After months of discovery, document review, and briefing, the Court found Plaintiffs were employees as a matter of law under the FLSA's economic reality test and also found Mack to be an employee as a matter of law under California's right to control test. *See* Dkt. No. 260. With a trial on damages only looming, Defendants stipulated to judgment for payment of all claims of unpaid overtime wages, liquidated damages, and interest under the FLSA for Boconvi in the amount of $2,500.00 and stipulated to judgment for payment of all claims of unpaid overtime wages, liquidated damages, and interest under the FLSA and a number of claims under California law, including similar claims for overtime and claims for expense reimbursements for Mack in the amount of $60,000.00. *See Boconvi/Mack*, Dkt. Nos. 30 & 32. As a result, the Court vacated the pretrial and trial dates. *See Boconvi/Mack*, Dkt. Nos. 31 & 35.

2. *Round Two—Tranche 1.*

On February 19, 2018, the Court approved and adopted the Parties' Amended CMO No. 4, outlining the discovery and individual trial plan for all remaining Plaintiffs. *See* Dkt. Nos. 300 & 304. Each Plaintiff was selected into one of six separate trial Tranches. *See* Dkt. No. 303. As contemplated by the amended discovery plan, Defendants produced the custodial files of current and former

---

employees, totaling approximately 1.3 million emails. Additionally, all available COPS data for each Tranche 1 Plaintiff was produced with analysis agreed-to by the Parties.

From April through September 2018, Plaintiffs unpacked, converted, catalogued, and reviewed Defendants' discovery productions. With this new data, Plaintiffs began creating a damages template and spreadsheets to fully understand the scope of Defendants' potential exposure. As part of the third mediation process, Plaintiffs provided Defendants all damages analysis and calculations resulting from this review and analysis.

### C.    Three Separate Mediation Sessions and Resolution.

Approximately two months before Plaintiffs filed their summary judgment motion as to successor liability in 2014, the Parties engaged a mediator (Mark Rudy) in an attempt to resolve the litigation. The mediation took place in San Francisco, California. Reaching an impasse on the outstanding successor liability issues, Plaintiffs' left the mediation shortly after arriving. A second mediation in April 2016 also ended in an impasse due to the outstanding issues of misclassification and willfulness. The Court later ruled in Plaintiffs favor in 2017. *See* Dkt. No. 260.

After Tranche 1 discovery commenced, the Parties agreed to a third and final mediation session in 2018. Prior to the mediations, Defendants produced (and Plaintiffs reviewed) hundreds of thousands of emails, COPS data analysis, Payment Histories, Settlement Reports, and route information. Plaintiffs presented Defendants with all spreadsheets used in determining potential exposure stemming from Defendants' classification scheme and the Court's' previous ruling on misclassification and willfulness. The mediation lasted over 8 hours, and continued on for the following seven days with multiple phone conferences and meet-and-confers between the Parties and the mediator. At the conclusion of the mediation process, the Parties accepted the Mediator's Proposal to resolve the litigation for $4,750,000. This number was a product of the Parties'—and the mediator's—extensive analysis and review of the discovery comprising the litigation.

## II.    THE PROPOSED SETTLEMENT.

The individual Plaintiffs subject to this Settlement include all 367 Named- and Opt-in Plaintiffs who complied with the PQ Process under CMO. No 1. *See Rusch Dec.* at Exhibit A. The $4,750,000

1   Settlement amount will cover: 1) payments to all participating Plaintiffs; 2) Plaintiffs' Counsel's fees;

2   and 3) Plaintiffs' Counsel's costs (taking into account Plaintiffs' Counsel is acting as the Settlement

3   Administrator and carrying the additional costs and burden to effectuate Settlement disbursements).

4   In short, Plaintiffs' Counsel will continue to incur fees and costs long after the Court approves this

5   Settlement.

6         All Plaintiffs ("Participating Driver"), except those who properly opt not to participate, will

7   receive a Settlement Share. *See Rusch Dec.*, Exhibit A at 2. A Participating Driver's Settlement Share

8   is calculated by dividing the number of calendar weeks worked by an individual Participating Driver

9   commencing from the date of the respective Participating Driver's filing of the Consent to Sue for a

10   period of three years plus an additional eleven weeks consistent with the Court's Minute Order No. 67

11   dated August 19, 2013 plus any additional weeks of service the Participating Driver provided

12   following filing of their Consent to Sue, by the total number of calendar weeks worked by all Plaintiffs.

13   *See Rusch Dec.*, Exhibit A at § I; *see also Rusch Dec.* at Exhibit B.

14         In calculating Settlement Shares for Participating Drivers, Participating Drivers who provided

15   services in California will be separately awarded 13% of the total Claims Share. The 13% allocated to

16   the California Participating Drivers accounts for the reimbursement expenses under California law.[6]

17   In total, $1,850,000 (the Claims Share) is allocated to Plaintiffs for their damages.[7] This extra 13%

18   averages a total recovery of 173% of the California Participating Drivers calculated Claims Share.

19       **A.**    ***An Overview of the MSA's Terms and Conditions Including the Claim Share and***

20            ***Allocation Plan.***

21         In general terms the MSA contemplates Defendants will pay $4,750,000 to resolve this

22   litigation. The amounts are broken into two groups: $1,850,000 for Participating Drivers (the Claims

---

23   [6] Plaintiffs' Counsel arrived at the 13% set-aside for reimbursement damages predicated in large part

24   on the actual break-down of damages between overtime hours for all Drivers and reimbursement

25   damages for the California Drivers. As noted above, the median recovery for California drivers is

    roughly 173% of that for non-California drivers.

26   [7] While the total Claims Share is $1,850,000, the first $62,500 are expressly reserved to satisfy the

27   *Boconvi* and *Mack* Judgment (*Boconvi/Mack* Dkt. No. 86). The balance is then allocated amongst the

28   remaining 365 Drivers to determine their individual Settlement Share.

**UNOPPOSED MOTION FOR APPROVAL**
**OF ATTORNEYS' FEES AND COSTS**
    6    **CASE NO.** 3:12-CV-05790-JST

Share) and $2,900,000 for attorneys' fees and costs. A Participating Driver, in turn, is entitled to an award comprised of four potential separate buckets of recovery: a) 1/3rd for unpaid wages; b) 1/3rd for liquidated damages; c) 1/3rd for interest; and d) for California Drivers a separate award for reimbursement of expenses. *See Rusch Dec.*, Exhibit A at 3 & 12. Upon approval, Plaintiffs will supply Defendants with a list of all Participating Drivers and the corresponding reward for each bucket. Defendants, in turn, will supply each Participating Driver an appropriate IRS Form 1099, if required, for any taxable income. *Id.* at 12.

The Claims Share shall be comprised of individual Settlement Shares for all Participating Drivers. *See Rusch Dec.*, Exhibit A at 3. The Settlement Share is subsequently divided into two groups: a) 87% of the Claims Share goes to compensate Participating Drivers for their overtime damages; and b) 13% is set aside to compensate California Drivers for expense reimbursement. Plaintiffs' Counsel arrived at this distribution based on two metrics. First, Plaintiffs' expert roughly opined that approximately 1/7th of the damages in this case related to mileage and reimbursement (*see Rusch Dec.* at ¶ 4). Second, for their part Defendants' calculated reimbursement damages as roughly 13% of the aggregate Claims Share. *See Rusch Dec.* at Exhibit D. Participating Drivers' individual Settlement Share is calculated by dividing the total number of eligible weeks of service into the respective amounts for overtime and reimbursement damages to determine a weekly rate. *See Rusch Dec.*, Exhibit A at 2.[8] That amount is then multiplied by the weeks of service for each individual driver to calculate their Individual Settlement Shares. *See Rusch Dec.*, Exhibit B.

### B. Participating Drivers' Rights and Privileges.

As noted above, this case involves the individual resolution of 367 former Velocity Drivers. Given this case involves resolution of individual driver's claims—as opposed to a collective or class resolution—it was, and is, Plaintiffs' Counsel's view that they should endeavor to obtain consent from each individual driver, as well as supply each individual driver the right to decide the outcome of their

---

[8] The amount is calculated after payment of the judgment to *Boconvi* and *Mack* which is deducted from the total Claims Share.

own individual claim.[9]   Accordingly, the MSA contemplates four discrete types of individual drivers. Each will be discussed in turn.

1.   *Participating Drivers*: A Participating Drier is defined as any driver who elects to participate in the Settlement, receive their Settlement Share, and be bound by the release. *Rusch Dec.*, Exhibit A at 3-4.

2.   *Non-Participating Drivers:* A Non-Participating Drier is defined as any driver who elects not to participate in the Settlement and continue to litigate. *Id.* at 6-7.

3.   *Challenge Drivers:* A Challenge Driver is defined as any driver who elects to challenge the number of allocated weeks of service. *Id.* at 2-3.

4.   *Absentee Participating Drivers:* An Absentee Participating Driver is defined as any driver who fails to elect to participate, declines to participate, or does not challenge the number of allocated weeks of service. *Id.* at 4.

Pursuant to the MSA, on October 25, 2016, Plaintiffs' Counsel sent each eligible driver via Priority U.S. Mail and electronic mail where available, Notice of the proposed Settlement. *See Rusch Dec.*, *MSA Exhibit B Notice* (submitted for in camera review). The Notice included the following: a) the anticipated number of weeks of service each individual driver worked for purposes of their individual Settlement Share; b) the estimated dollar amount Plaintiffs' Counsel anticipated the Court may award for each week of service; c) a detailed description of each individual driver's rights and obligations; and d) a consent to participate. *Rusch Dec.*, Exhibit A at 12; *see also Notice* (submitted for in camera review).

Mechanically, the MSA requires each driver to make an election to: a) consent to participate; b) elect not to participate; or c) challenge the award. Drivers who elect to participate in the

---

[9]  This is not to suggest that the *only* method for resolving this Settlement must be through individual assent. Specifically, Courts in this District have held that a party may be bound by a settlement's terms—assuming it is fair and reasonable—by virtue of opting-in to a collective action. *See Order, Lewis et al v. Wells Fargo & Co.*, Case No. 08-cv-2670 (N.D. Cal., Apr. 29, 2011) (approving FLSA Collective Action Settlement); *Lewis et al v. Wells Fargo & Co.*, Case No. 08-cv-2670 (N.D. Cal, Feb. 25, 2011) at Dkt. No. 309-2 (Exhibit A notice of settlement of *Lewis v. Wells Fargo*), Order and Dkt. No 309-2 attached to *Rusch Dec.* as Ex. I. While this mechanism exists for the Court to employ, it is Plaintiffs' Counsel's view that given the relationship with their Clients that, at this point, obtaining individual consents to participate is the preferred format.

Settlement—and receive their Settlement Share—are instructed to return the Consent to Participate to Plaintiffs' Counsel on or before November 14, 2018. *Rusch Dec.*, Exhibit A at 12. Drivers who decline to participate or challenge the number of weeks of service are required to inform Plaintiffs' Counsel of their intention on or before November 14, 2018 in writing. Non-Participating Drivers are excluded from the Settlement and retain their individual right to continue to litigate. *Id.* Per the MSA, for each Non-Participating Driver, Defendant is entitled to receive a ratchet back from the Claims Share equal to their individual Settlement Share. This is not a reversion because these Drivers, if any, retain the right to pursue their own individual recovery through continued litigation.

Challenge Drivers are drivers who may or may not ultimately participate in the Settlement. *Rusch Dec.*, Exhibit A at 12-13. Specifically, the MSA entitles each Driver to challenge the number of designated weeks of service. *Id.* As noted above, weeks of service were determined based on individual Driver files supplied to Plaintiffs' Counsel during discovery. *See Rusch Dec.* at ¶ 6. While the MSA presumes that the Records supplied by Defendants during discovery are presumptively correct, the MSA entitles each Driver to challenge the award with evidence to support a longer tenure (in no instance will the allocated weeks of service go down). Specifically, the MSA requires each Driver to submit their challenge to Plaintiffs' Counsel on or before November 14, 2018. *Id.* at 6-7. Plaintiffs' Counsel, in turn, are directed to attempt to resolve the challenge, if able. For those Drivers whose challenges are not resolved (i.e., who refuse to execute a Consent to Participate), the MSA directs Plaintiffs' Counsel to inform the Court of the impasse prior to the hearing on November 15, 2018. Unresolved challenges, if any, will then be resolved by the Court. *Id.* A Challenging Plaintiff whose challenge is not resolved to their satisfaction is deemed to be a Non-Participating Plaintiff (i.e., a Plaintiff who elects not to participate in the Settlement) and will retain the same rights as a Non-Participating Plaintiff.

The final group of Drivers are Absentee Participating Drivers. Specifically, any Driver who fails to make an election as a Participating Driver, Non-Participating Driver, or Challenging Driver is

deemed to be an Absentee Participating Driver.[10]  Per the MSA, in the event Plaintiffs fail to satisfy the Participation Rate threshold set forth below, the MSA expressly contemplates an adjudication process for Absentee Participating Drivers as follows:

> If an individual [driver] fails to return a Consent to Participate, notice of his or her intention to be a Non-Participating Driver or intention to proceed as a Challenging Driver, the individual Driver shall be deemed to be an "Absentee Participating Driver". For all Absentee Participating Drivers, the Parties expressly agree the claims shall be resolved as follows: a) all Absentee Participating Driver shall have and additional thirty (30) days commencing on November 15, 2018 and ending on December 14, 2018 to make a designation of their intention to become a: 1) Participating Driver; or 2) Non-Participating Driver; and b) for any Absentee Participating Driver who fails to take any action, or make any election, prior to December 14, 2018, Defendants shall be entitled to file a Motion to Dismiss the Absentee Participating Driver's case for failure to prosecute on or before December 17, 2018. The Court shall then enter an order administratively dismissing the claim.
>
> [F]or all Absentee Participating Drivers whose claims are dismissed for failure to prosecute, their respective Settlement Share(s) shall be reallocated amongst all Participating Drivers pursuant to the Proposed Allocation Plan set forth above.

*Rusch Dec.*, Exhibit A at 13-14. In other words, for those Drivers who, for whatever reason, decline to do anything, the MSA imposes a procedural vehicle to dispose of their claims with no reduction (i.e., reversion) to the amount of the total Claim Share. In the event Defendants opt to fund, as set forth below, the individual Settlement Share for these Drivers is retained in the ultimate Claims Share which is subsequently distributed to all Participating Drivers as part of their individual Settlement Share.

### C.  Implementation of the Settlement, Withdraw Right, and the Effective Date.

Finally, given this Settlement involves resolution of individual claims, the MSA contemplates certain thresholds that dictate when and if the Settlement will be funded. Specifically, the MSA contemplates that if Plaintiffs' Counsel secures 363 of the total 367 individual Drivers' consent to participate Defendants are obligated to fund the Settlement. *Rusch Dec.*, Exhibit A at 7. However, if five or more individual Drivers affirmatively elect not to participate, Defendants must inform the Court

---

[10]  The MSA defines Absentee Participating Driver as: "[a]ny Plaintiff who fails to return a Consent to Participate on or before November 14, 2018, and does not formally elect to be excluded from the Settlement (Non-Participating Driver) or challenge their individual Settlement Share (Challenging Plaintiff)."

UNOPPOSED MOTION FOR APPROVAL OF ATTORNEYS' FEES AND COSTS          10          CASE NO. 3:12-CV-05790-JST

of its intention to fund at the November 15, 2018, hearing. *Id.* at 12. Plaintiffs' Counsel is required to provide periodic updates as to the number of consents and elections not to participate that they receive. *Id.*

In the event the number of Absentee Drivers, Non-Participating Drivers, or Unresolved Challenging Drivers totals five or more the MSA contemplates that Defendants may move the Court on December 15, 2018, to administratively dismiss the claims of all Absentee Drivers. *Id.* at 13-14. Defendants, in turn, are then required to inform Plaintiffs' Counsel of their intention to fund the Settlement on or before December 17, 2018. Generally, the Effective Date for the Settlement is linked to: a) Plaintiffs' satisfaction of the outlined thresholds; b) approval of the Settlement by the Court; and/or c) Defendants' designation that it intends to fund the settlement notwithstanding Plaintiffs' ability to satisfy a given threshold.

## ARGUMENT

Employees cannot waive their rights under the FLSA "because this would nullify the purposes of the statute and thwart the legislative policies it was designed to effectuate." *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981) (internal quotation omitted). "Thus, either the Secretary of Labor or a district court must approve the settlement for any FLSA claim." *Gonzalez v. Fallanghina, LLC*, Case No. 16-cv-1832-MEJ, 2017 WL 1374582, at *2 (N.D. Cal. Apr. 17, 2017); *see also Slezak v. City of Palo Alto*, Case No. 16-cv-3224-LHK, 2017 WL 2688224, at *1 (N.D. Cal. June 22, 2017).

"The Ninth Circuit has not established the criteria that a district court must consider in determining whether an FLSA settlement warrants approval." *Otey v. Crowdflower, Inc.*, Case No. 12-cv-5524-JST, 2015 WL 6091741, at *4 (N.D. Cal. Oct. 16, 2015). Courts in this district typically evaluate the settlement under the standard established by the Eleventh Circuit's decision in *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350 (11th Cir. 1982); *see also Gonzalez*, 2017 WL 1374582, at *2; *Slezak*, 2017 WL 2688224, at *2. Thus, the courts consider whether the settlement agreement is "a fair and reasonable resolution of a bona fide dispute." *Lynn's Food Stores, Inc.*, 679 F.2d at 1355. If the settlement is a reasonable compromise over issues actually in dispute, the court

1

may approve the settlement "to promote the policy of encouraging settlement in litigation." *Id.* at 1354.

2

## I.    THE JOINT SETTLEMENT COMPORTS WITH THE REQUIREMENTS OF *LYNN'S FOODS.*

3

4

In the "context of suits brought directly by employees against their employer," under Section

5

216(b) of the FLSA, the standard for approval of a settlement is straightforward: if the Parties present

6

a proposed settlement to the District Court that was reached as a result of a contested litigation and the

7

settlement is a fair and reasonable resolution of a bona fide dispute between the Parties, the District

8

Court may approve the FLSA settlement. *Lynn's Food*, 679 F.2d at 1352-54. Accordingly, before this

9

Court may grant the Parties Settlement, the Court must be satisfied that 1) the settlement was the

10

product of "contested litigation"; and 2) the settlement involves a fair and reasonable resolution of a

11

bona fide dispute between the Parties.

12

### A.    The Settlement is a Direct Result of Vigorously Contested Litigation.

13

There is no question the Parties' settlement is a direct result of vigorously contested litigation.

14

This case has been actively litigated by both Parties for over six years. Following conditional

15

certification and the Notice Period, the Parties engaged in three separate waves of extensive written

16

discovery. Defendants produced millions of pages of documents, the Parties conducted dozens of

17

depositions in the United States and Canada, and Plaintiffs filed two contested motions for summary

18

judgment. The Parties also entered into two separate bellwether processes to take 64 individual cases

19

to trial.

20

Defendants have consistently denied liability throughout the tenure of this Action, asserting

21

that Plaintiffs are exempt independent contractors exempt from overtime pay under the FLSA and

22

California wage-and-hour laws. Similarly, Plaintiffs maintain that Defendants willfully misclassified

23

Plaintiffs as independent contractors when, in fact, they were employees. Opposing positions on the

24

issue of liability is in essence the definition of "contested litigation." Despite each of the Parties good-

25

faith belief that their respective position was correct, following vigorous litigation conducted to date,

26

the Parties recognized the potential benefits of mediation and settlement negotiations prior to

27

conducting scores of depositions in preparation for the 61 Tranche 1 trials.

28

### B.     The Settlement is a Fair and Reasonable Resolution of a Bona Fide Dispute.

"A *bona fide* dispute exists when there are legitimate questions about the existence and extent of the defendant's FLSA liability." *Gonzalez*, 2017 WL 1374582, at *2 (internal quotation and modification omitted). As discussed supra, the Parties dispute whether Plaintiffs were independent contractors or employees. The Parties also dispute whether Defendants are successors in liability to Velocity Express. Thus, the only question remaining is whether the settlement is "fair and reasonable."

In reviewing whether a settlement is fair and reasonable, courts consider the "totality of the circumstances and the purposes of [the] FLSA." *Slezak*, 2017 WL 2688224, at *3 (internal quotation omitted). Thus, courts have considered the following factors:

> (1) the plaintiff's range of possible recovery; (2) the stage of proceedings and amount of discovery completed; (3) the seriousness of the litigation risks faced by the parties; (4) the scope of any release provision in the settlement agreement; (5) the experience and views of counsel and the opinion of participating plaintiffs; and (6) the possibility of fraud or collusion.

*Id.* at *2 (quoting *Selk v. Pioneers Mem'l Healthcare Dist.*, 159 F. Supp. 3d 1164, 1173 (S.D. Cal. 2016)).

#### 1.     The Plaintiffs' range of possible recovery.

As this case has evolved, the Parties' used several metrics to understand the total amount of damages potentially at stake. Because there was no other reliable data (at the time) to review the number of hours Plaintiffs worked, Plaintiffs relied on Plaintiff Questionnaire responses to determine the total number of hours each Plaintiffs worked on a per week basis. Though Defendants rejected this method of calculating damages, Plaintiffs' expert calculated overtime damages totaling approximately $3,000,000. As the case progressed, and further discovery occurred, Plaintiffs were able to obtain and review the actual scan data for each Plaintiff where Defendants could retrieve the COPS data. This data was produced pursuant to Amended CMO No. 4 in preparation for the 61 Tranche 1 trials. Using this data, Plaintiffs were able to calculate and extrapolate overtime damages totaling approximately $1,500,000. *See Rusch Dec.* at ¶ 6; Exhibit E. Defendants, for their part, calculated the potential

overtime exposure at *less than* $365,000. *See Rusch Dec.*at ¶ 5, Exhibit D.[11]

What constitutes hours worked each workday, along with the appropriate rate of pay, was hotly disputed between the Parties. While Plaintiffs argue each Plaintiff spent 2 (or more) hours of work not captured by the scan time date (e.g., load vehicles, driving to the first stop, driving back to the warehouse after the last stop, etc.), Defendants argue that this un-captured time, if at all, was minimal. The absence of the full range of scan time data for all Plaintiffs—and the incomplete nature of the data for most individuals—made exact calculations for each Plaintiff a difficult process requiring detailed and complex expert testimony at trial predicated largely on trends within the data that do exist to extrapolate an individual driver's overtime. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1043-7, 194 L. Ed. 2d 124 (2016). The ultimate question of which data points would form the basis for determining damages was resolved at mediation by the Parties' agreement to use the number of weeks Plaintiffs worked and extrapolate it across the total number of weeks all Plaintiffs worked through their individual statutory periods.

While the Parties are confident in their exhaustive review and analysis of the data, a pro rata distribution is in the Parties' interest because of the significant risk in continued litigation. Should Plaintiffs prevail at all trials and appeals, the exposure from those claims is significant. Conversely, a trial court, or the Ninth Circuit Court of Appeals, could determine Defendants' drivers are in fact properly classified as independent contractors and/or that Dynamex is not a successor in liability to Velocity Express, making Plaintiffs' recovery *zero*. *See also infra* § I.B.3. This factor weighs in favor of approval.

>    2.    *The stage of proceedings and amount of discovery completed.*

In reviewing this factor, courts generally review "the amount of discovery completed to ensure the parties have an adequate appreciation of the merits of the case before reaching settlement." *Jennings* v. *Open Door Marketing, LLC*, Case No. 15-cv-04080-KAW, 2018 WL 4773057, at *5 (N.D.

---

[11]  The Calculated Exposure Chart also confirms that a 13% set aside for reimbursement and mileage damages in fair. Specifically, Defendants' calculated the mileage and reimbursement damages as roughly 15% of the Plaintiffs' Overtime Damage representing 13% of the total award ($363,00 + $54,500 = $417,500; $54,500/$417,500 = 13.06%). *See Rusch Dec.* at ¶ 5; Exhibit D.

Cal. Oct. 3, 2018) (citing *Slezak*, 2017 WL 2688224, at *4). "So long as the parties have sufficient information to make an informed decision about settlement, this factor will weigh in favor of approval." *Jennings*, 2018 WL 4773057, at *5 (citing *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998)).

This case has been in litigation for approximately six years. Two motions for summary judgment were filed and ruled on, three separate stages of discovery are complete save for depositions of the custodians noted for the 61 Tranche 1 trials. All told, Plaintiffs have received and reviewed over 3,000,000 pages of documents, served multiple sets of interrogatories, document requests, and requests for admissions. Plaintiffs also received thousands of Settlement Reports, COPS data analysis spreadsheets, route information, and personnel files. The Parties heavily investigated the claims and damages of each individual Plaintiff, down to a workweek-by-workweek analysis. This "deep dive" into the data in this case allowed the "parties . . . to narrow the issues in the case and adequately assess the likelihood of success at trial." *See Selk*, 159 F. Supp. 3d at 1177 (noting the parties ability to narrow the scope of the litigation through discovery to understand the likelihood of success at tried weighs in favor of approval); *see also Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) (finding that a district court could find that counsel had a good grasp on the merits of the case before settlement where "[e]xtensive discovery had been conducted, and the parties had gone through one round of summary judgment proceedings"). The "extent of discovery and the stage of proceedings thus favors approval." *Selk*, 159 F. Supp. 3d at 1177; *see also Ching v. Siemens Industry, Inc.*, No. 11-cv-04838-MEJ, 2014 WL 2926210, *5 (N.D. Cal. June 27, 2014) (extent of discovery weighed in favor of approving a settlement where class counsel "conducted interviews, propounded extensive written discovery, discussed the case with opposing counsel, analyzed thousands of pages of documents, deposed Defendants' person most knowledgeable, analyzed damages, reviewed time and pay records and policy documents, and collected evidence").

This factor weighs in favor of approval.

### 3. The seriousness of the litigation risks faced by the parties.

Both Parties face *significant* risks should litigation in this case continue through to trial. Those

---

risks include:

- For Plaintiffs, the risk that the Court of Appeals might reverse the Court's Order on Successor Liability—thus leaving no recoverability for any Plaintiff for any damages;

- For Plaintiffs, the risk that the Court of Appeals may reverse the Court's Order on Liability and Willfulness—potentially requiring a full merits trial in the *Boconvi* and *Mack* case (along with all other cases);

- For Plaintiffs, the risk that the Appellate Court (or this Court) will not find all of the remaining 365 Plaintiffs to be employees rather than independent contractors—thus making their damages $0.

- For Defendants, the possibility of the remaining 365 Plaintiffs recovering the full measure of all potential damages at trial, thereby exposing them to additional costs, attorneys' fees, and interest;

- For Defendants, the possibility of the California Plaintiffs recovering the full measure of their FLSA *and* California damages (including, for example, all owed mileage); and

- For the Parties, years of additional litigation and millions of dollars in additional fees and costs.

In sum, the far-ranging risks of continued litigation to both Parties is significant. *See, e.g.*, *Jennings*, 2018 WL 4773057, at *6 (noting this factor favors a settlement when there is a significant right continued litigation could result in a lesser recovery); *see also Selk*, 159 F. Supp. 3d at 1176-77 (finding this factors weighs in favor of approval when "there is a significant risk that litigation might result in a lesser recover[y] for the class or no recovery at all." (internal quotation omitted). As such, this factors favors approval.

> 4. *The scope of any release provision in the settlement agreement.*

In comporting with precedent in the Northern District of California, the Parties seek a release of all claims related *only* to those plead in the Fourth Amended Complaint. *See Rusch Dec.*, Exhibit A at § 1 ("Participating Driver Released Claims"); *see also Jennings*, 2018 WL 4773057, at *7 (approving release providing tailored to the scope of the operative complaint); *Selk*, 159 F. Supp. 3d at 1178 (approving settlement release that "generally tracks the wage and hour claims asserted in the

---

1    lawsuit"). The fact the release is limited in scope to those claims actually plead in the FAC favors

2    approval.

3              5.       *The experience and views of counsel and the opinion of participating plaintiffs.*

4              To determine whether a settlement is fair and reasonable, "the opinions of counsel should be

5    given considerable weight both because of counsel's familiarity with the litigation and previous

6    experience with cases. *Jennings*, 2018 WL 4773057, at *8 (quoting *Slezak*, 2017 WL 2688224, at *5).

7    Here, Plaintiffs' Counsel believe the Settlement is fair, reasonable, and adequate in light of the

8    circumstances of the case. Plaintiffs are represented by experienced attorneys who specialize in FLSA

9    litigation. Defendants are also represented by experienced employment attorneys, and recently settled

10   a similar litigation with Dynamex and a separate group of independent contractors.[12] Together, the

11   attorneys support the Settlement and attest that it was only reached through extensive preparation by

12   experienced attorneys and the assistance of mediator Mark Rudy. *See Rodriguez*, 563 F.3d at 967

13   ("[p]arties represented by competent counsel are better positioned than courts to produce a settlement

14   that fairly reflects each party's expected outcome in litigation") (citations and internal quotations

15   omitted).

16             Additionally, Plaintiffs' Counsel mailed a detailed Notice to every Plaintiff which described

17   the following: a) the allocation plan; b) the anticipated scope of their respective award; c) their

18   individual options ranging from participation in the Settlement to requesting exclusion so as to

19   continue to litigate their claims; and d) requesting they affirmatively indicate s/he elects to participate

20   in the Settlement. Additionally, Plaintiffs' Counsel intends to contact each of our Clients by phone,

21   email, and letter to explain, in detail, the mechanics of the Settlement and how it specifically affects

22   their individual claim. Pursuant to the MSA, the initial wave of electronic and written notifications

23   were sent on October 25, 2018. As of the date of this drafting Philip Flores, the Named-Plaintiff and

24   originator of this lawsuit, and 114 other Plaintiffs have already consented to participate and none have

25   objected. This factor weights in favor of approving the settlement.

26

27   [12]  As the Court is aware, Dynamex is the Defendant in this litigation who purchased Velocity Express
     in 2013.

28

**UNOPPOSED MOTION FOR APPROVAL**            17            CASE NO. 3:12-CV-05790-JST
**OF ATTORNEYS' FEES AND COSTS**

6.      *The possibility of fraud or collusion.*

Nothing in the facts of the Record, the mechanics of the Settlement, or the intent of the Parties shows any possibility of fraud or collusion. Moreover, the "likelihood of fraud or collusion is low here because the Settlement was reached through arm's-length negotiations, facilitated by an impartial mediator." (citing *City P'ship Co. v. Atl. Acquisition Ltd. P'ship.*, 100 F.3d 1041, 1043 (1st Cir. 1996) ("When sufficient discovery has been provided and the parties have bargained at arms-length, there is a presumption in favor of the settlement."). By selecting to participate in the Settlement, every Plaintiff in this case will receive a monetary award based on the total number of weeks they worked. In other words, *every* participating Plaintiff will receive a monetary award. *See Slezak*, 2017 WL 2688224, at *5 (noting no evidence of "subtle" collusion signs when, for example, counsel is amply rewarded while a class receives no monetary distribution at all).

Additionally, Plaintiffs' individual recoveries are not based on arbitrary conclusions; rather, the Parties reviewed multiple data points to determine the number of workweeks each Plaintiff worked throughout the statutory period. Plaintiffs' Counsel compared Plaintiff Questionnaire answers to multiple data points produced by Defendants to estimate the number of weeks worked. These numbers were given to each individual to review, accept, or challenge. *See Rusch Dec.*, Exhibit A at 12. Because the Parties determined individual workweeks based on analysis of Plaintiffs' and Defendants' records, it "guards against the arbitrariness that might suggest collusion." *Selk*, 159 F. Supp. 3d at 1179.

Throughout the entirety of this case, Plaintiffs' Counsel has put the interests of the Named- and Opt-in Plaintiffs *first*. During all three mediations, Plaintiffs' Counsel first and foremost tried to get Plaintiffs their alleged damages. In fact, the first two mediations ended not because of Plaintiffs' Counsel arguing for attorneys' fees and costs at all. Rather, early resolution attempts broke down because of significant disagreement between the Parties over the Plaintiffs' damages, Defendants' defenses, the strength of the liability case, and the threat of appeal. In fact, during the Boconvi and Mack settlement attorneys' fees and costs were never even discussed. From the outset, and to this day, Plaintiffs' Counsel has litigated for the Plaintiffs and not for their own benefit.

In sum, all factors weigh in favor of approving the Joint Settlement.

1

2

## II.     THE COURT SHOULD APPROVE THE PROCESS TO ADJUDICAT THE CLAIMS OF ABSENTEE DRIVERS.

3

4       As noted above, the MSA expressly includes a category of Drivers described as Absentee

5   Drivers. Absentee Drivers are those that, over the course of a fifty-one (51) day period took no action

to participate or decline participation in the Settlement. The MSA defines Absentee Drivers as:

6

7       [a]ny Driver who fails to return a Consent to Participate on or before November 14, 2018
        and does not formally elect to be excluded from the Settlement (Non-Participating
        Driver) or challenge their individual Settlement Share (Challenging Plaintiff).

8

*Rusch Dec.*, Exhibit A at 4-5. In short, they are Drivers who have remained silent throughout the

9   process. The silence will not be without considerable effort to contact them. Specifically, the MSA

10  requires Plaintiffs' Counsel to disseminate Notice to each driver via U.S. Priority Mail and electronic

11  mail. Plaintiffs' Counsel complied with this obligation on or about October 25, 2018. *See Rusch Dec.*

12  at ¶ 7. Throughout the life of this case, Plaintiffs' Counsel has maintained close contact with its Clients,

13  supplied them dozens of update letters, assisted them with preparation of the Plaintiff Questionnaire,

14  fielded countless phone calls, assisted them with discovery, and were generally available to answer

15  their individual questions. Each update letter requested updates to email and physical addresses in an

16  effort to maintain the Client's current whereabouts. *Id.* at ¶ 8. In an effort to administer the Settlement,

17  Plaintiffs' Counsel has assembled a team of no less than eight paralegals and five lawyers to assist

18  Clients in completing their individual Consents, answer questions, and, where required, engage in

19  skip-tracing of any non-responsive Clients. Simply put, Absentee Clients represent individuals who

20  simply are nonresponsive.

21      For the Drivers who are non-responsive, the MSA contemplates a process that will result in

22  the administrative dismissal of their claims *without prejudice.* Where a Driver fails to indicate their

23  intent to participate (or not) by November 14, 2018, the Settlement affords the individual Driver an

24  additional thirty (30) days to elect some form of participation or dissent, meaning the Absentee Driver

25  effectively has fifty-one (51) days to make an election. Specifically, the MSA contemplates the

26  following:

27      If an individual Driver fails to return a Consent to Participate, notice of his or her

28

---

**UNOPPOSED MOTION FOR APPROVAL OF ATTORNEYS' FEES AND COSTS**         19         **CASE NO**. 3:12-CV-05790-JST

intention to be a Non-Participating Driver or challenge to his calculated work weeks, the individual Driver shall be deemed to be an "Absentee Participating Driver". For all Absentee Participating Drivers, the Parties expressly agree the claims shall be resolved as follows: a) all Absentee Participating Drivers shall have an additional thirty (30) days commencing on November 15, 2018 and ending on December 14, 2018 to make a designation of their intention to become a: 1) Participating Driver; or 2) Non-Participating Driver; and b) for any Absentee Participating Driver who fails to take any action, or make any election, prior to December 14, 2018, Defendants shall be entitled to file a Motion to Dismiss the Absentee Participating Driver's case for failure to prosecute on or before December 17, 2018. The Court shall then enter an order administratively dismissing the claim of that Absentee Participating Driver.

*Rusch Dec.*, Exhibit A at 14-15. It is black letter law that the failure to prosecute a claim is an appropriate basis for dismissal.[13] Here, Absentee Drivers are those who fit this definition by refusing to keep in contact with their lawyers or alternatively fail to respond to their lawyer's request regarding their participation in the Settlement. As noted above, Plaintiffs' Counsel has sent dozens of update letters and correspondence to their Clients—each of which urged Clients to alert their lawyers of any change in residence or contact information. Equally important, Plaintiffs' Counsel has amassed a team of more than a dozen lawyers and paralegals to assist Drivers with the Settlement process, engaging in nearly daily efforts to contact Drivers impacted by the Settlement. In short, a Driver who fails to communicate with Plaintiffs' Counsel during this time period is simply a Client who is nonresponsive. Further, Plaintiffs' Counsel intends to continue to attempt to contact its Clients upon and until expiration of the Absentee Driver period on December 15, 2018. In short, the MSA imposes sufficient due process protection to ensure that those Drivers who actually wish to participate have ample opportunity to do so. *See e.g.*, *Thompson v. Costco Wholesale Corp.*, No. 14-cv-2778-CAB-WVG, 2017 WL 1957552, at *9 (S.D. Cal. May 11, 2017) (allowing the individuals subsumed within the settlement 45 days to either elect to participate in the settlement, object to the settlement, or request to

---

[13] *See* Dkt. No. 291 (noting that dismissal is appropriate when a plaintiff fails to appear to litigate their claims "when there is no guarantee he will ever do so") (citing *Thomas v. California Victim Comp. Program*, No. 16-cv-07653-JLS-RAO, 2017 WL 1508558, at *3 (C.D. Cal. Mar. 13, 2017), *report and recommendation adopted*, No. 16-cv-07653-JLS-RAO, 2017 WL 1505590 (C.D. Cal. Apr. 24, 2017) ("The Court deems it imprudent to wait any longer for Plaintiff to exhibit an interest in prosecuting this action with the requisite amount of diligence.").

---

**UNOPPOSED MOTION FOR APPROVAL OF ATTORNEYS' FEES AND COSTS**

**CASE NO**. 3:12-CV-05790-JST

1  be excluded from the settlement). Because these Clients are nonresponsive, the Court is within its

2  discretion to dismiss those claims for failure to prosecute. *See infra* n.13.[14] Accordingly, the Court

3  ought to adopt the proposal for Adjudication of Absentee Driver's claims set forth in the MSA.

4  **III.    PLAINTIFFS' REMAINING ATTORNEYS' FEES AND COSTS ARE REASONABLE.**

5        As this court is well aware, the FLSA *requires* that a settlement agreement include an award

6  of reasonable attorneys' fees and costs. *Fulton v. TLC Lawn Care, Inc.*, No. 10-2645-KHV, 2012 WL

7  1788140, at *4 (D. Kan. May 17, 2012) (citing *Gambrell v. Weber Carpet, Inc.*, No. 10-2131-KHV,

8  2012 WL 162403, at *3 (D. Kan. Jan. 19, 2012)). "Payment of attorney fees and costs to a prevailing

9  party in an FLSA action is *mandatory*." *Mendoza v. Valley Park Apartments, Inc.*, No. 13-cv-00002-

10 PAB-KMT, 2014 WL 984687, at *6 (D. Colo. Mar. 13, 2014) (quoting *Wright v. U-Let-Us Skycap*

11 *Servs., Inc.*, 648 F.Supp. 1216, 1218 (D. Colo. 1986)) (emphasis in original).

12       As with any FLSA case, the plaintiffs' attorney's fees and costs are part of the damages to be

13 negotiated in a settlement. *Gamble v. Boyd Gaming Corp.*, No. 2:13-cv-01009-JCM-PAL, 2015 U.S.

14 Dist. LEXIS 107279 (D. Nev. Aug. 13, 2015). A negotiated fee is preferred because it prevents

15 attorneys' fees from becoming "a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437

16 (1983) ("Ideally, of course, litigants will settle the amount of a fee."). Courts therefore have "a

17 responsibility to encourage agreement" on fees where possible. *Blum v. Stenson*, 465 U.S. 886, 902

18 n.19 (1984). In this settlement, the attorneys' fees were included in and negotiated at the mediation

19 according to time records and with the fee shifting provision of the FLSA and 9th Circuit case law.

20       The lodestar fee method commonly used in FLSA cases can result, as is true here, in fee awards

21 that exceed the actual back wage amounts obtained in the lawsuit for the workers. This is especially

22 true given that most FLSA claims do not involve significant amounts of money. *See, e.g.*, *James v.*

23 *Wash Depot Holdings, Inc.*, 489 F. Supp. 2d 1341 (S.D. Fl. May 14, 2007) (awarding attorney fees of

24

---

25  [14]  Courts also commonly find that an attorney has a near unqualified right to withdraw from
    representation where the client is non-responsive. *See e.g.*, *Woolley v. Ygrene Energy Fund, Inc*., No.
26  17-cv-01258-LB, 2018 WL 558938, at *2 (N.D. Cal. Jan. 25, 2018) (emphasizing permitting counsel
    to withdraw is well within the sound discretion of the court and finding good cause exists for
27  withdrawal because the client has not participated in the case, despite counsel's efforts and reasonable
    steps to avoid prejudice).

28

---

$114,021 on a judgment of $3,493.62); *Wales v. Jack M. Berry, Inc.*, 192 F. Supp. 2d 1313 (M.D. Fl. Dec. 21, 2001) (awarding attorney fees of $352,225.40 on an FLSA recovery of $21,000); *Lucio-Cantu v. Vela*, 239 Fed. Appx. 866 (5th Cir. 2007) (finding no abuse of discretion in award of $51,750 in attorney fees on a recovery of $4,679); *Howe v. Hoffman-Curtis Partners Ltd., LLP*, 215 Fed. Appx. 341, 342 (5th Cir. 2007) (affirming attorney fees of and $129,805.50 on $23,357.30 in damages); *Holyfield v. F.P. Quinn & Co.*, No. 90 C 507, 1991 U.S. Dist. LEXIS 5293, 1991 WL 65928, at *1 (N.D. Ill. Apr. 22, 1991) (awarding $6,922.25 in attorney fees and costs on a judgment of $921, and noting that "[g]iven the nature of claims under the FLSA, it is not uncommon that attorneys' fee requests will exceed the amount of the judgment in the case). Further, awarding a large fee based on lodestar in a successful FLSA claim promotes the vindication of statutory rights, even if it does not result in a substantial monetary recovery. *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1033 (9th Cir. 2012); *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1473 (9th Cir. 1983), abrogated on other grounds by *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 539, 105 S. Ct. 1005, 83 L. Ed. 2d 1016 (1985) (affirming fee award of $100,000 for a less than $20,000 recovery).

Plaintiffs' Counsel's fees and cost request should be granted to ensure they receive as close to their actual attorneys' fees as possible. It was through this lawsuit that approximately $1.875 million is available to pay wages to Velocity Express drivers who would never have been paid without the six-year effort and this lawsuit.

To begin, on May 17, 2018, after intensive briefing on Plaintiffs' Motion for Attorneys' Fees and Costs following the stipulated judgments of Plaintiffs Boconvi and Mack, the Court awarded $2,124,031.14 in attorneys' fees and $136,575.60 in costs. *See* Dkt. No. 82. During briefing, Plaintiffs' submitted attorneys' fees in the *Boconvi/Mack* Action[15]—including work performed in *Flores*—that reasonably related to the unmitigated victory of Plaintiffs Boconvi and Mack. *See Boconvi/Mack*, Dkt. No. 41-49, 57-62, 70-72, 74-75.[16]   Accordingly, because Plaintiffs only submitted time to the Court

---

[15]  *See generally Claude K Boconvi and James R. Mack v. Velocity Express, LLC,* Case No. 3:17-cv-02623-JST.

[16]  Plaintiffs specifically incorporate the entire record regarding attorneys' fees and costs in support of

1   that benefitted Plaintiffs Boconvi's and Mack's successful results, Plaintiffs reserved the right to move

2   for the remaining fees not subsumed within the time submitted or time deemed not relevant to Plaintiffs

3   Boconvi or Mack. *See e.g.*, Dkt. No 70 at n.3. Specifically, at the time Plaintiffs moved for fees in

4   costs in *Boconvi* there was an additional **$615,625.05** of fees for work done on behalf of all drivers

5   and an additional **$144,969.91** of costs related to costs that did not directly benefit *Boconvi* (e.g., filing

6   fees for other plaintiffs, conditional certification notice costs, the Plaintiff Questionnaire process). *See*

7   *generally Rusch Dec.* at ¶¶ 9-11; Exhibits F-H. Following entry of Amended CMO No. 4, Plaintiffs

8   incurred substantially more attorneys' fees and costs to bring about the Settlement. *See id.* To date,

9   the total collective amount of attorneys' fees and costs in this case is ~**$4,000,000.** Moreover, Plaintiffs

10   will continue to incur fees and costs up to and through the settlement administration process (including

11   all postage). Thus, in addition to the attorneys' fees and costs previously awarded, Plaintiffs

12   respectfully request the Court award Plaintiffs' Counsel's attorneys' fees and costs totaling

13   $2,900,000. The current request, not opposed by Defendants, represents a discount of ~30% in

14   attorneys' fees and costs. *See id.*

15           **A.**    ***Plaintiffs are Entitled to Attorneys' Fees and Costs Under the FLSA and the Court***
16                ***Should Use the Lodestar Method to Determine the Reasonableness of Attorneys'***
                ***Fees Not Subsumed Within the May 17, 2018 Order.***

17           As this Court has already previously held, the FLSA states that "[t]he court in such action

18   ***shall***, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a ***reasonable attorney's***

19   ***fee*** to be paid by the defendant, ***and costs*** of the action." 29 U.S.C. § 216(b) (emphasis added); *see*

20   *also Dunn v. Teachers Ins. & Annuity Ass'n of Am.*, No. 13-cv-05456-HSG, 2016 WL 153266, at *4

21   (N.D. Cal. Jan. 13, 2016) ("The FLSA contains a mandatory fee– and cost-shifting provision."). The

22   FLSA awards attorney's fees and costs to the "prevailing party." *Newhouse v. Robert's Ilima Tours,*

23   *Inc.*, 708 F.2d 436, 441 (9th Cir. 1983). The Supreme Court found a prevailing party is one "in whose

24   favor a judgment is rendered" or one who secures a "settlement agreement[] enforced through a

25   consent decree" even when the consent decree does not include an admission of liability by the

26

27   _____

28   the instant Unopposed Motion.

1   defendant because it is "nonetheless [] a court-ordered 'chang[e] [in] the legal relationship between

2   [the plaintiff] and the defendant.'" *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health*

3   *& Human Res.*, 532 U.S. 598, 603 (2001) (internal citations omitted). Here, as the Parties reached

4   settlement, Plaintiffs are the "prevailing party" and ought to be awarded attorneys' fees and costs under

5   the FLSA. *See, e.g.*, *Otey*, 2015 WL 4076620, at *6, *modified*, No. 12-cv-05524, 2016 WL 304747

6   (N.D. Cal. Jan. 26, 2016) (Tigar, J.); *Slezak*, 2017 WL 2688224, at *5 (N.D. Cal. June 22, 2017).

### B.   Plaintiffs' Counsel's Requested Lodestar Not Subsumed in the May 17, 2018 Order is Reasonable.

9        Besides exercising billing judgment by not requesting attorneys' fees in the original fee petition

10   for work performed that did not directly benefit Plaintiffs Boconvi or Mack, Plaintiffs also have not

11   requested any of their fees or costs incurred in this Action since August 2, 2017. *See* Dkt. No. 41

12   (filing of Plaintiffs Motion for Approval of Attorneys' Fees and Costs). Plaintiffs have incurred

13   **$739,253.35** in fees since August 2, 2017. *See Rusch Dec.* at ¶¶ 9-11; Exhibits F-H. The additional

14   fees requested represent Plaintiffs' Counsel's lodestar incurred 1) on work that benefitted all Plaintiffs

15   in this case not previously requested; 2) on conducting extensive and exhaustive discovery for all

16   Tranche 1 Plaintiffs; 3) in preparing for and attending mediation; and 4) in preparing the Settlement

17   Agreement and motion. Defendants do not object to the allocation of attorneys' fees and costs

18   requested.

### 1.   Work performed that was removed from the original fee petition.

20        Plaintiffs' Counsel have not yet moved the Court for work performed that did not directly

21   benefit Plaintiff Boconvi or Plaintiff Mack during the first round of fees and costs briefing. For

22   example, attorneys' fees regarding conditional certification notice, the Plaintiff Questionnaire process,

23   and discovery and deposition practice regarding other Plaintiffs was not included. The Court ought to

24   consider these fees now as the work performed was both reasonable and necessary to prosecute this

25   case diligently and effectively for Plaintiffs. The attorneys' fees originally removed eclipsed $600,000.

26   *See Rusch Dec.* at ¶¶ 9-11; Exhibits F-H.

2.      *Continued litigation of the Action.*

As this Court is well-aware, it has taken nearly six years for the Parties to reach settlement. After settlement of Plaintiffs Boconvi and Mack, Plaintiffs' Counsel continued to litigate this case, which included multiple meet-and-confers and court conferences to establish Amended CMO No. 4—outlining discovery, organizing the Plaintiffs into Tranches, and establishing the trial plan for moving forward with this litigation. *See, e.g.*, Dkt. Nos. 303-04. The Court selected 61 individuals to proceed through discovery and prepare for trial in Tranche 1. *See id*. Plaintiffs' Counsel swiftly and diligently contacted all 61 individuals in Tranche 1 to prepare them for the discovery process and trial. Furthermore, Plaintiffs' Counsel engaged in multiple meet-and-confers with Defense Counsel regarding Defendants' obligations, including the identification of relevant facility managers, regional managers, and the COPS data required. Throughout this time, Plaintiffs' Counsel reviewed relevant documents and data, served written discovery, prepared to take depositions of Defendants' current and former employees, and began working with Defense Counsel on determining an efficient way to conduct the many Plaintiffs' depositions that were needed to litigate Tranche 1.

Accordingly, the Court should find the fees Plaintiffs' Counsel incurred while continuing to litigate Tranche 1 were not only reasonable, but necessary. Defendants do not oppose Plaintiffs' request of $2,900,000 in attorneys' fee and costs. This amount is composed of the initial fees and costs award of $2,260,606.74 plus an additional $639,393.26 for fees and costs for work completed outside of the fees requested as part of the Boconvi/Mack settlement. Though Plaintiffs' incurred an additional $1,538,233.06 in fees and costs outside of the Boconvi/Mack attorneys' fees motion, Plaintiffs only seek request $639,393.26 into this Settlement. *See Rusch Dec.* at ¶¶ 9-11; Exhibits F-H.

Thus, the Parties agreement to include $2,900,000 for attorneys' fees and costs is reasonable and should be approved.

## **CONCLUSION**

For the foregoing reasons, the Parties request the Court approve the Joint Settlement in its entirety.

Dated: October 26, 2018

Respectfully Submitted,

By: /s Timothy J. Becker
Timothy J. Becker (MN Bar No. 256663)
tbecker@johnsonbecker.com
Jacob R. Rusch (MN Bar No. 391892)
jrusch@johnsonbecker.com
Molly E. Nephew (MN Bar No. 397607)
mnephew@johnsonbecker.com
JOHNSONBECKER, PLLC
444 Cedar Street, Suite 1800
St. Paul, Minnesota 55101
Telephone: (612) 436-1800
Fax: (612) 436-1801

Jason J. Thompson (MI Bar No. P47184)*
jthompson@sommerspc.com
Jesse L. Young (MI Bar No. P72614)*
jyoung@sommerspc.com
*pro hac vice anticipated
SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
Telephone: (248) 355-0300

*Trial Counsel for Plaintiffs*

Christopher P. Ridout (SBN 143931)
christopher.ridout@zimmreed.com
ZIMMERMAN REED, LLP
2381 Rosecrans Ave., Suite 328
Manhattan Beach, CA 90245
(877) 500-8780 Telephone
(877) 500-8781 Facsimile

*Local Counsel for Plaintiffs*

1
2
3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

4
5
6
7
8
9
10
11
12
13
14
15

| | |
|---|---|
| PHILLIP FLORES and DARAH DOUNG, individually and on behalf of all similarly situated individuals, <br><br>          Plaintiffs, <br><br> v. <br><br> TFI INTERNATIONAL INC., a Foreign Corporation, F/K/A TRANSFORCE INC., a Foreign Corporation, and TFORCE FINAL MILE, LLC, a Foreign Limited Liability Company, F/K/A TF FINAL MILE, LLC, a Foreign Limited Liability Company, F/K/A DYNAMEX OPERATIONS EAST, LLC, a Foreign Limited Liability Company, F/K/A DYNAMEX OPERATIONS EAST, INC., a Foreign Corporation, <br><br>          Defendants, | Case No. 3:12-cv-05790-JST <br><br> Assigned for all purposes to the Honorable Jon S. Tigar <br><br> **This Document Relates to All Cases.** <br><br> **PROPOSED ORDER** <br><br> Complaint Filed:   November 9, 2012 <br> Date:             November 15, 2018 <br> Time:             2:00 p.m. <br> Courtroom:     9 – 19th Floor <br> Complaint Filed:   May 5, 2017 |

16
17
18
19
20

      The above-entitled matter came before the Honorable Judge Jon S. Tigar, on November 15, 2018, at the San Francisco Courthouse for the Northern District of California, Courtroom 9 – 19th Floor, on the Parties' Unopposed Motion for Approval of Joint Stipulation of Settlement; Attorneys' Fees and Costs.

21
22

      Based on the files, records, and proceedings herein and the arguments of counsel, IT IS HEREBY ORDERED that:

23

      1.      The Parties Joint Stipulation of Settlement and Release is approved in its entirety;

24
25

      2.      The Court specifically adopts the proposal and deadlines for Adjudication of Absentee Driver's claims set forth in the MSA;

26

      3.      The Court grants Plaintiffs' Counsel fees and costs totaling $2,900,000.00.

27
28

---

1

**SO ORDERED.**

2

Dated: _____, 2018

3
_____
JON S. TIGAR
UNITED STATES DISTRICT COURT JUDGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28